**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                                         :
In re:                                                   :    Chapter 11
                                                         :
STANDARD AMUSEMENTS LLC,[1]                               :    Case No. 19-_____ (RDD)
                                                         :
                                        Debtor.          :
                                                         :
                                                         :
-------------------------------------------------------- x

### NICHOLAS SINGER'S DECLARATION PURSUANT TO RULE 1007-2 OF LOCAL BANKRUPTCY RULES FOR SOUTHERN DISTRICT OF NEW YORK IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Nicholas Singer, declare under penalty of perjury:

1.      I am the founder of Standard Amusements LLC ("SA" or the "Debtor"), a limited liability company organized and existing under the laws of the State of Delaware and headquartered in Rye, New York.  SA was created in 2011 for the sole purpose of managing and operating Rye Playland ("Playland" or the "Park"), a historic and iconic 280-acre waterfront public property located 25 miles north of New York City on the Long Island Sound, containing an amusement park, nature preserve, boardwalk, pier, public beach, and indoor skating rink.

2.      SA's mission is to modernize Playland, preserve this nationally registered historic treasure and irreplaceable piece of Westchester's history for future generations, and restore Playland to profitability.  In furtherance of this goal, we have assembled a top-notch amusement park management team, which includes world-class architects with expertise in public parks and historical sites and a nationally renowned preservationist.  SA also has widespread support from the Westchester community including key stakeholders such as the Westchester and Rye Historical

---

[1] The last four digits of the Debtor's federal tax identification number is: 0982, and the address of the Debtor's principal place of business is 1 Playland Parkway, Rye, New York 10580.

Societies, the Edith G. Read Sanctuary (which operates the adjacent nature preserve), and the Save Rye Playland advocacy group.  Local support for SA also stems from the expectation that upon SA assuming operational control of Playland, there will be a significant increase in the number of local individuals employed, to the benefit of the Westchester community.

3.      I was born and raised in Harrison, New York and for many years Playland was the center of the universe for me and my family.  It was our amusement park, the only beach we knew in the summer, and where we ice skated in the winters.  After graduating Harrison High School, I graduated from the University of Pennsylvania with degrees in electrical engineering and economics.  While I currently reside in Miami, Florida, I still own my childhood home in Harrison, New York (a ten-minute drive from Playland).

4.      Prior to founding SA, I was the co-founder of Cyrus Capital and later Standard General, investment management firms located in New York City.  In that capacity, I focused on the rehabilitation of distressed assets and on positioning the companies in which my firms invested to create long-term value.  In 2015, the Business Council of Westchester named me a "Rising Star Under 40."

5.      My experience investing in amusement park assets while at Standard General led me to form SA in 2011.  At the time, Westchester County (the "County") was requesting proposals from private investors willing to provide Playland with desperately needed investment capital and share the burden of management.  This outreach to the private sector came after years of mismanagement and declining attendance at Playland, resulting in annual multimillion-dollar losses that were passed onto Westchester's taxpayers.  Given my expertise in rehabilitating distressed assets and my intimate familiarity with the Park as a lifelong Playland

2

patron, I felt uniquely qualified to partner with the County to restore Playland to its former prominence and turn a strain on Westchester's budget into a profitable business.

6.      As discussed in detail below, I represented SA from 2011 to 2014 during an extended request for proposal process, and in negotiating a management agreement with the Executive branch of the County, that was subsequently further negotiated and then unanimously approved by the Board of Legislators ("BOL") and the Board of Acquisition and Contract ("BAC") in 2015 (as amended, supplemented or restated, the "Agreement").[2]  However, over four years later, full operational and management control of Playland has still not transitioned from the County to SA, as new County leadership has decided that it is not satisfied with the economic terms of the fully executed Agreement and does not need to honor it, notwithstanding the fact that the County has no legal basis to terminate the Agreement.  Acting on its repeated threats to walk away from the Agreement, the County has willfully breached its performance obligations to SA, while at the same time manufacturing fallacious claims that SA is itself in breach.  Without the Agreement—which the County officially noticed for termination effective May 28, 2019—SA would lose access to its only source of future revenue and its rights under a contract it negotiated and has performed in good faith.

7.      As a result of the foregoing, I am extremely familiar with SA's business, day-to-day operations, financial matters, operating results, business plans, actual and projected cash flows, and underlying books and records.  Except as otherwise indicated, all facts and opinions set forth in this Declaration are based on my personal knowledge or discussions with key

---

[2] The present contract is the Restated and Amended Playland Management Agreement dated May 3, 2016. A true and correct copy of the Agreement is attached hereto as Exhibit A.

SA personnel.  I am authorized to submit this Declaration on behalf of SA and, if called to testify, I would testify competently to the facts set forth in this Declaration.

8.      I submit this Declaration pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") for the purpose of apprising the Court and parties in interest of the circumstances that led to the commencement of this Chapter 11 case and in support of the motions that the Debtor has filed with the Court, including the "first-day motions" filed contemporaneously herewith (collectively, the "First-Day Pleadings").  This Declaration is divided into four parts.  **Part I** describes SA's business and organizational structure. **Part II** describes the circumstances leading to the commencement of this Chapter 11 case.  **Part III** summarizes the First Day Pleadings and explains why the relief requested therein is necessary to stabilize and continue SA's operations, minimize the potential adverse effects of filing for bankruptcy, and ease the administrative burden of operating in Chapter 11.  **Part IV** provides certain disclosures required by Local Rule 1007-2.

## I.    SA OVERVIEW

9.      SA finds itself in Chapter 11, after exhausting all other alternatives, because of the unjustified, bad faith efforts of the County to repudiate the Agreement approved by the BOL and BAC.  The Agreement, which is SA's principal asset and only source of future revenues, requires SA and the County each to make substantial investments necessary to rehabilitate and modernize Playland, contemplates a transition of Playland management from the County to SA after the County has completed 50% of its investment obligations, and provides for payment of management fees and a percentage of net income from SA to the County once SA assumes operational control.  While the Agreement contemplated that the County would expend 50% of its

investment commitment by the end of 2017 (and 90% by the end of 2018), to date the County has funded less than 10%.

10.     In stark contrast to the County's actions, SA has faithfully performed under the Agreement in all respects since its execution.  SA had a willing counterparty in the County until January 1, 2018, when George Latimer took office as County Executive, replacing Robert Astorino.  This changing of the guard immediately imperiled SA's ability to continue to operate as a going concern, with Mr. Latimer and other County officials issuing numerous public statements (discussed in detail below) making clear that they believe the Agreement—a binding contract negotiated by a prior administration—was not in the best interests of County residents and needed to be renegotiated or terminated.

11.     Not surprisingly, over the course of 2018, in addition to ignoring its obligations under the Agreement to make desperately needed capital investments in Playland, the County repeatedly and baselessly claimed that SA had violated the Agreement, and burdened SA with due diligence requests far beyond what is contemplated under the Agreement.  Throughout that time period, SA sought on numerous occasions to engage the County in discussions about the County's concerns with SA's performance under the Agreement, SA's concerns with health and safety conditions at Playland, and the County's failure to honor its contractual investment commitments.  As part of this process, SA even offered to substantially increase its own investment commitments under the Agreement, asking no additional consideration from the County other than a promise to honor the contract it signed in 2016.  And, as noted above, SA has not been able to assume operational and management control of Playland by the date contemplated under the Agreement—which was extended numerous times with the County's request and SA's consent— because the County has failed to come close to funding 50% of its total investment commitment.

12.     To date, SA has expended over $9 million under the Agreement (including certain non-refundable deposits paid to the County) without receiving even a dollar in return on SA's investment.  SA's investors remain committed to continue funding SA although such funding is expressly conditioned on the Agreement remaining in full force and effect.  If there is a successful resolution of SA's disputes with the County, funding to SA by its investors will be automatically restored.

13.     Thus, faced with the risk of liquidation as a result of the County's intent to terminate the Agreement on May 28, 2019, SA filed for Chapter 11 relief in order to preserve its key asset, continue its mission to save and modernize Playland within its historical context, and restore Playland to profitability.

14.     As explained in detail below, from the date of the County's December 7, 2018 notice of default, I have repeatedly offered to negotiate with the County to resolve and address disputed issues and raised concerns.  Unfortunately, the County has publicly rebuffed every overture of reconciliation advanced by me to negotiate in good faith, and declined numerous requests to clearly explain how the alleged breaches of the Agreement could be cured.  As a result, SA seeks recourse to Chapter 11 for the benefit of all of its stakeholders not only to preserve and protect its economic and legal rights under the Agreement but also to restore and revitalize Playland for the public good without further delay or cost.[3]  Toward that end, during the next 60 days, SA seeks to emerge from Chapter 11 predicated on the following: (i) a consensual or judicial resolution of all issues or disputes concerning the Agreement; (ii) judicial approval of SA's assumption of the Agreement as an executory contract under Bankruptcy Code section 365,

---

[3] SA remains open to participating in mediation in an attempt to consensually resolve all outstanding disputes concerning the Agreement.

6

including satisfaction of adequate assurance of future performance; and (iii) confirmation and consummation of a Chapter 11 plan of reorganization predicated on the foregoing, including payment in full of all allowed claims and satisfactory compliance with the other necessary requirements under the Bankruptcy Code.

### A.    The Debtor's Business

15.    SA was formed on March 3, 2011 to provide management and operational oversight of Playland.

16.    SA is 90% owned by United Parks Holdings LLC ("UPH"), which in turn is wholly owned by United Parks LLC ("UP LLC").[4]  UPH controls two other amusement park assets:  Daytona Lagoon Waterpark in Daytona, Florida and Hydro Adventures in Poplar Bluff, Missouri.

17.    SA is managed by PCI UP, LLC ("PCI"), which controls 62.81% of UP LLC with other minority investors owning the remaining equity.  Through my ownership of PCI, I serve as SA's managing principal.  On average, I spend between 20 and 80 hours a week working on behalf of SA.  But I have not taken a salary nor received any other compensation from SA since 2011 (other than a $1,000 monthly health insurance stipend).

### B.    SA's Funding

18.    SA is currently funded by cash distributions from UP LLC (passed through UPH ), which enable SA to meet its contractual obligations under the Agreement.  My co-investors in UP LLC have conditioned future contributions to SA (beyond the amounts necessary to fund SA's Chapter 11 case) on the existence of a binding and enforceable Agreement.  Assuming the

---

[4] Dragon Partners, LLC, an unaffiliated entity, acquired a 10% membership interest in the Debtor in May 2017.

resolution of the contractual issues with the County discussed in detail below, SA will have ample funding to continue performing under the Agreement and honor all future investment obligations set forth therein.

### C. SA's Management Team

19.     In preparation for SA assuming operational and management control of Playland, I have worked hard to assemble one of the finest amusement park management teams in the country.  The team, which includes Beau Berni (General Manager), Evonne Felix (Director of Operations and Chief Administrative Officer), Doug Anderson (Chief Financial Officer), John Harding (Vice President of Food and Beverage), and Andy Maniglia (Vice President of Government and Community Affairs), collectively have over 100 years of experience in amusement park management, food and beverage, and community engagement.[5]  Over the past three years, they have worked diligently on preparing SA's draft master plan (which envisions a prosperous future for a modernized Playland in its historical context after the infusion of capital by SA and the County contemplated under the Agreement), met on regular basis with architects, marketing consultants, civil engineers, environmental engineers and ride manufacturers, and studied how to improve food and beverage options throughout the Park.  This team and their accomplishments to date give my investors and me confidence that SA can reverse the course of Playland's recent history and preserve this landmark site for future generations of Westchester residents.

---

[5] As detailed in the Wages Motion (defined below), Mr. Berni, Mr. Harding, and Mr. Maniglia are employed directly by SA.  While Ms. Felix and Mr. Anderson are employed by UP LLC, SA reimburses UP LLC for their extensive SA-related services.

8

D.      **SA's Outstanding Debt Obligations**

20.     SA has no long-term funded debt obligations. As of the Petition Date, SA has approximately $529,000.00 in trade debt owed to approximately 18 creditors (excluding intercompany debt).

## II.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

A.      **Playland Overview and the 2010 RFP**

21.     Playland is a historic and unique park.  Founded in 1928, it boasts the Nation's only Art Deco amusement park, an Olympic-size swimming pool, ice skating rinks, and sweeping views of the Long Island Sound, among other attractions.  The Park has 50 major rides and attractions.  As its website observes, Playland was designed and built to be "the jewel in the crown of Westchester's extensive park system."

22.     Since its founding, Playland has been owned and operated by the County. Beginning around 2005, the County witnessed a precipitous decline in Park attendance and revenue as consumer tastes changed and Park amenities aged.  Specifically, from 2005 to 2009, Playland's attendance dropped from approximately 1 million visitors per year to 615,000.  The downturn in attendance increasingly required the County to subsidize Playland's budget at the taxpayers' expense.

23.     Seeking a solution, and recognizing that millions of dollars in new investment would be needed to revitalize the Park, the County issued a request for proposals ("RFP") in 2010 from potential private sector partners.  The RFP noted, among other things, that:

> ▪ "The downturn in attendance has translated directly into greater county subsidies.  Playland has been costing Westchester taxpayers millions of dollars each year with no end in sight.  At a time when the county is facing the stark possibility of laying off workers to balance its books, using tax dollars to subsidize an amusement park seems irresponsible and unsustainable;"

- "The County . . . is facing difficult economic challenges and must reduce its overall costs and/or seek to increase revenue without further burdening taxpayers. Playland Park has regularly suffered operating losses and requires constant infusions of capital for new rides and attractions to remain competitive, as well as for maintenance of existing infrastructure;" and

- "The [C]ounty is one of only a handful of governmental bodies to be in the amusement park business, which means tax dollars are placed at risk each year against the profitability of the park. Westchester County is not necessarily looking to make a profit off Playland, although such an outcome would certainly be welcome. As with its other parks, the county's interest is to provide broad access to a resource that enhances the quality of life of residents. The mission, therefore, is to balance access with affordability."[6]

24.    In response to the RFP, the County received twelve proposals. SA's proposals outlined a vision for a public-private partnership through which SA and the County would collectively fund much-needed infrastructure improvements and SA would ultimately provide the private amusement park management expertise and its own capital investment required to bring Playland into the 21st century.

25.    The County ultimately selected SA as the winning respondent at the end of 2014. In June 2015, after months of discussions and comprehensive due diligence, conducted separately by both the County's Executive branch and the BOL, the parties agreed to terms and executed a management agreement. On the County's side, then-County Executive Robert Astorino signed the agreement and it was unanimously approved by the BOL and BAC.

26.    The parties subsequently agreed in 2015 to extend certain deadlines under the contract in order to allow SA to complete additional due diligence. Following completion of this extended diligence period, SA and the County executed the Agreement on May 3, 2016. Under the Agreement, which remains the operative contract between the parties, SA agreed to increase

---

[6] Reinventing Playland Park for the 21st Century, Request for Proposals to: Develop, Manage, Operate and Maintain and/or Propose Other Options for Playland Park. Release Date: August 27, 2010.

its original investment commitment in exchange for the County agreeing to fund certain infrastructure improvements, all of which were critical to public safety and for SA to proceed with its full capital program. Mr. Astorino signed the contract and it was approved by a bipartisan supermajority of the BOL and unanimously by the BAC, which adopted acts approving the contract itself and the individual projects to which the County's investment commitments would be directed.

### B.    Overview of the Agreement

27.    The Agreement provides that in the initial years of their partnership, both the County and SA would, on a defined schedule, make investments designed to improve Playland, setting the stage for SA to assume Playland's management after a portion of the investments had been made.

28.    In particular, SA committed to make a "Manager's Investment" of $27,750,000 (which could be increased by an additional $5 million at the Manager's sole discretion). Section 1(C) of the Agreement provides that "***all*** funds spent by the Manager after May 1, 2016 will count toward the Manager's Investment." And although Schedule C-1 allocates the Manager's Investment to various line items (such as new rides, pavement work, and restoration of historic rides), Section 3(D) of the Agreement makes clear that the "Manager shall have flexibility to make reasonable adjustments to each item outlined in Schedule 'C-1' in order to effectuate the improvements contemplated therein and also to provide flexibility to implement this Agreement." SA complied with its obligation to fund $2,000,000 of the Manager's Investment by

11

December 31, 2017, and has funded all additional refundable and non-refundable deposits required under the Agreement as of the Petition Date.[7]

29.    The County, for its part, agreed to issue bonds and expend the bond funds toward capital projects listed in Schedule "K" of the Agreement.  When the Agreement was executed, the parties estimated that the Schedule "K" Capital Projects would cost approximately $33 million.    The capital improvement projects included: tower rehabilitation; shoreline improvements; structural restoration of arcades, restrooms, employee areas, food structures, and old games row; site and parking lot improvements; ride improvements; storm reconstruction; and bathhouse reconstruction.  On June 19, 2017, the BOL passed Act No. 113-2017, which authorized an additional $9,540,000 in funding to restore the Playland Pool, increasing the total amount that the County committed to Schedule "K" Capital Projects to nearly $43 million.  The County's commitment to infuse new investment into Playland's aging infrastructure was critical to SA's willingness to invest in the Park and ultimately take over the facility's management.

30.    With respect to Playland management and operational control, the parties outlined a phased schedule for transitioning management from the County to SA, governed, in part, by when the parties reached defined milestones in funding their investment commitments. Upon the Agreement's execution, a "Co-Management Period" began during which the County retained full operational control of Playland while SA conducted due diligence related to its future assumption of management responsibility.  The Co-Management Period would end, and full management responsibility for Playland transfer to SA, once the County had funded 50% of its

---

[7] In light of the subsequent contractual disputes discussed below, it is important to note that the County recieved monthly statements that SA was required to provide the County under the Agreement.  These statements tracked amounts expended by SA towards its Manager's Investment commitment on a monthly and aggregate basis.  On December 20, 2017, the County acknowledged that the statements previously provided by SA indicated that SA has satisfied its obligation to fund $2,000,000 of the Manager's Investment by December 31, 2017.

Schedule "K" investment commitment (the "50% Threshold").  The Agreement originally set

December 31, 2017 as the deadline for the County to meet that 50% Threshold.

31.     The Agreement requires SA to pay an annual management fee to Playland

after the Co-Management Period ends ($300,000 for the first year and subsequently adjusted for

inflation).  Additionally, following termination of the Co-Management Period and recoupment by

SA of the Manager's Investment and certain other payments, the Agreement provides for the

sharing of net income between SA and the County according to a yearly schedule.  The result of

these management fees and profit sharing arrangement is that, in contrast to the annual losses the

County has experienced on Playland operations for years, it now stands to receive millions of

dollars in fees and profit shares from SA over the term of the deal, at little risk to the County,

according to the very projections on which the parties based the Agreement.

### C.      County Performance Prior to 2018

32.     Prior to 2018, the County and SA enjoyed a cooperative relationship.  The

parties entered into six letter-agreements memorializing agreed-to extensions of certain deadlines,

including the deadline for the County to meet the 50% Threshold.  The final extension agreement

was a December 20, 2017 letter in which SA agreed to extend the County's deadline for meeting

the 50% Threshold by thirteen months, to January 31, 2019—even though this extension would

substantially delay SA's assumption of full management and operation of the Park and, thus, its

opportunity to realize a return on its ongoing investment of time, personnel, and money.

### D.      New County Leadership Repudiates the County's Obligations Under the Agreement

33.     The parties' cooperative relationship soured beginning when, on January 1,

2018, George Latimer took office as County Executive, replacing Robert Astorino.

13

34.     The Latimer administration has not denied that the Agreement is the product of fair negotiations, that it was properly authorized and executed by the County, or that its terms are binding on the County.  It has, instead, taken the position that the Agreement's terms are not to its liking, sufficiently "unfavorable" to the County, and that the County should walk away from its deal with SA, even though SA has held up its end of the bargain and retains an executed contract.

35.     The drumbeat to threaten SA with baseless breach claims as a pretext for terminating the Agreement began within weeks of the County Executive assuming office.  In March 2018, County Legislator Catherine Parker held a press conference "calling [on] the Latimer administration to find a way to invalidate the contract."[8]  The County Executive took up her suggestion and stated publicly that it had "some very great concerns" about the Agreement with SA and that these concerns "open[] the door for *at the very least* further dialogue about whether the relationship should continue in the fashion that was agreed upon."[9]

36.     On May 6, 2018, the County held a press conference during which Mr. Latimer reinforced the County's intention to renegotiate the Agreement irrespective of actions taken by SA.  As stated during the press conference:

> I do not view in any of this Standard Amusements in a negative light. I have spoken with Nick Singer and his principals.  I think they're fine men and women and they intend as part of their vision to do what they think is best.  **The question is whether or not the deal that we have on the table is the right thing to do and what flaws exist in the arrangements that were made and whether or not we're in a position to change them.**

---

[8] *See* "Rob Astorino Westchester privatization deals under review by George Latimer" (March 29, 2018), available at https://www.lohud.comJstory/money/personal-finance/taxes/david-mckaywilson/ 2018/03/29 /westches ter-pri vatization-deals-under-review-george-latimer-reconsiderspredecessor-rob-as torino-pri/466027002/.

[9] See "Playland" (May 7, 2018), available at https: //www.youtube.com1watch?v= QWvIFIKdwLM&t=55s.

37.     In a report dated May 7, 2018, the County made clear its intent to escape the Agreement by asserting, without grounds, that (1) more capital improvements are required to place Playland in an appropriate physical condition to attract increased attendance than were originally foreseen; (2) the Agreement requires the County to incur "expenses, risks and obligations" after the Management Commencement Date (as defined in the Agreement) that the County wishes to avoid; (3) the revenue share agreed to under the Agreement was not sufficiently favorable to the County; (4) SA has not provided its financial review as requested by the County within the time frame required; (5) the extension letters granted by the County were not voted on by the BOL; (6) one particular manager is no longer employed by SA; and (7) so-called changed circumstances change the balance of the parties' obligations.

38.     Between January 2018 and December 2018, the County refused to identify changes to the Agreement that it would have liked to see made in a consensual renegotiation. Instead, the County harassed SA, peppering SA with demands for financial and other information under the guise of "due diligence," while simultaneously refusing SA's reasonable requests that the County meet its own obligations under the Agreement.

39.     During this period, as part of SA's preparation prior to the management handover, SA commissioned a report by Michael A. Friend, a highly qualified third-party expert in food safety, who was asked to evaluate Playland's food concessions for compliance with relevant County health codes. Mr. Friend's findings (the "Friend Report") stated that the "risk of a food-borne illness at Rye Playland [wa]s imminent" if the Park's subpar facilities were not addressed immediately. The Friend Report noted a myriad of public health concerns, including, but not limited to, a lack of pest control, a lack of handwashing facilities in food preparation areas, lead-based paint contamination, damaged refrigeration, black mold at the walk-in refrigerator,

unsecured electrical wires, and unsealed openings that could allow access by vermin and insects, which led Mr. Friend to conclude that Playland was "unfit to provide safe food service to the general public." SA immediately shared the Friend Report with the County. But rather than acknowledge or fix the problem, the County criticized SA, arguing in an April 13, 2018 letter from County Parks Commissioner Kathleen O'Connor that SA's documentation of the food safety issues at Playland was somehow a breach of SA's duty to cooperate with the County under the Agreement.

40.     The County similarly rebuffed an inspector's finding of safety problems on the "Dragon Coaster" rollercoaster ride. In 2017, a qualified third party, Great Coaster International, Inc. ("GCI"), a noted national leader in coaster safety inspections, outlined a significant number of improvements that needed to be made to address imminent threats to the safety of Playland's guests. The ride was described as having cracks, improper footers, improperly nailed members, cut support members, and extensively rusted bolts from its original construction in 1928. The wooden structure was also riddled with "instances of rotted posts" that the report noted were "[t]hroughout the ride." Many of these repairs were needed before the next season in order to avoid an immediate risk to riders. SA was, and remains, highly concerned about these public safety issues and immediately raised the GCI report's findings with the County to enable corrective actions to be planned and implemented. The County, however, failed to make the necessary corrective repairs recommended in the 2017 GCI report to ensure public safety. After receiving the 2017 GCI report, the County initially represented that certain repairs, such as replacing improperly cut wood members, would take place before the 2018 season. But SA later learned, through a subsequent 2018 GCI report, that many of these critical repairs were not made

prior to the 2018 season, and that the County continued to subject Playland's patrons to these significant risks throughout 2018.

41.     The County has also failed to satisfy the 50% Threshold by failing to fund its $21.5 million investment commitment on or before January 31, 2019.  Indeed, the County is nowhere close to complying with that requirement.  To date, the County has expended a mere $3 million, and to SA's knowledge, the County has not made any significant Parkland related expenditures since April 2018 (a fact I could verify if the County were complying with its obligation to send SA monthly reports).  Reaching the 50% Threshold now would require many months, or even years, because the County has not even begun soliciting bids, retaining vendors, and preparing design plans needed before it can expend significant sums.

42.     While neglecting its duties to manage and to invest in the Park, the County continued to launch false accusations against SA.  This culminated, on December 7, 2018, in the County issuing a written notice to SA of purported breaches—none of which are supported by facts—and stating the County's intent to terminate the Agreement.  The principal basis for the County's notice—that SA was improperly counting certain overhead expenditures towards SA's investment commitment—was contradicted by the plain terms of the Agreement summarized above (and the acknowledgements made by the County in numerous SA countersigned monthly statements and the December 20, 2017 letter agreement).  On December 20, 2018, SA responded to the County's notice with a detailed reply, refuting each and every breach allegation and stating that SA intended to hold the County to the contractual relationship the parties had negotiated and performed for years.

43.     The County responded in a December 24 letter stating that, because the parties had scheduled a meeting for January 7, 2019, the County would "adjourn" the period for

SA to cure the alleged breaches to February 28, 2019.  The County later canceled the January 7

meeting.  Nonetheless, in a February 27, 2019 letter, SA (while continuing to dispute the County's

assertions) offered to reduce its calculation of the Manager's Investment to date by $2,696,977.

That amount corresponded, to the dollar, with the expenditures the County had alleged were

improperly allocated.  The County rejected that offer, contending that it was not sufficient and

therefore it did not qualify as a cure.

44.     In an April 12, 2019 letter, SA agreed to increase its total investment

commitment from $27.75 million to $32.75 million.  The County objected to that overture and

disparaged SA for having made the offer, despite the fact that the combined dollar value of these

changes would essentially have negated the financial impact on the County of the dispute related

to SA expenditures as of that date.

45.     On April 26, 2019, the County notified SA that the County had elected to

terminate the Agreement based on SA's alleged failure to cure its various material events of

default.  The County designated May 28, 2019 as the termination date.  In response, SA sent a final

letter to the County offering to write off all amounts SA has expended to date that the County

reasonably deems unacceptable in exchange for a commitment from the County to honor its

obligations under the Agreement.  The County did not respond to this final letter.

46.     On May 27, 2019, faced with no other alternative to avoiding the

Agreement's termination, and the resulting liquidation, SA filed for Chapter 11 relief in this Court.

**E.      Termination of the Agreement Would Irreparably Harm SA**

47.     The Agreement, and its promise of future revenue from the operation and

management of Playland, is SA's sole asset.  SA has no current source of revenue or liquidity other

than the commitments of its investors to support SA.  But that investment is conditioned on a

favorable resolution of SA's disputes with the County, at which point such investment will be

automatically restored. Thus, without the protection of Chapter 11, SA would have to cease business operations and immediately shut down. Such imminent financial distress creates a present need for Chapter 11 protection to allow SA to preserve its business as a going concern and maximize the value of its only asset.

48.     SA has a bona fide need for a breathing spell to reorganize so that it can pursue assumption of the Agreement and to cure any purported defaults in accordance with Bankruptcy Code section 365. To be clear, SA has fully complied with its obligations under the Agreement, and there are no uncured defaults that would pose any obstacle to assumption, SA's ultimate goal for this Chapter 11 case. As I understand it, Chapter 11 delivers such benefits: (i) Bankruptcy Code section 362 provides an automatic stay of all actions that interfere with property of the estate or assert any claims against the debtor, prohibiting the County from terminating the Agreement or otherwise taking steps that would frustrate SA's preservation of the Agreement; (ii) Bankruptcy Code section 365 offers SA the opportunity to assume the Agreement and to demonstrate adequate assurance of its future performance, thereby paving a path to a clearer future; and (iii) even if there is a determination that SA failed to satisfy any of its obligations under the Agreement, Bankruptcy Code section 108(b) grants the debtor a sixty-day extension to cure any default the deadline for which has not expired before the petition date.

49.     Accordingly, through this Chapter 11 case, SA hopes to achieve an expedited determination of all disputed issues related to the Agreement and authorization to assume the Agreement, which will allow for the successful confirmation of a plan of reorganization that will benefit all of SA's stakeholders, including the residents of Westchester County.

## III.     SUMMARY OF THE FIRST DAY PLEADINGS

50.     Concurrently with the filing of this Chapter 11 case, SA filed the following First Day Pleadings:

a) Debtor's Motion for Entry of an Order Extending Time for the Debtor to File Schedules and Statements ("<u>Schedules Extension Motion</u>").

b) Debtor's' Motion for Entry of Interim and Final Orders (I) Authorizing (A) Continued Use of the Debtor's Cash Management System and (B) Postpetition Intercompany Transactions; (II) Waiving Certain United States Trustee Requirements; and (III) Granting Related Relief ("<u>Cash Management Motion</u>");

c) Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Employee Compensation Obligations and (II) Granting Related Relief ("<u>Wages Motion</u>"); and

51.    Having reviewed each of the First Day Pleadings or had their contents explained to me, I believe that SA would suffer immediate and irreparable harm absent the ability to continue its business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief sought in the First Day Pleadings is critical to SA's efforts to reorganize and conduct this case efficiently, thus permitting SA to preserve and maximize value for the benefit of all stakeholders.

52.    Several of the First Day Pleadings request authority to pay prepetition claims.  I am told by SA's advisors that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court may not consider motions to pay prepetition claims during the first 21 days following the filing of a Chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this exception, SA has limited its requests for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to SA and its estate.  Consequently, certain aspects of the relief sought in the First Day Pleadings will be deferred for consideration at a later hearing, as indicated therein.  With respect to the other First Day Pleadings, set forth below are the reasons why I believe it is imperative that the Court grant the relief requested.

### A.  Schedules Extension Motion

53.  SA requests a 30-day extension for the time by which SA must file its schedules of assets and liabilities, schedules of current income and current expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements"), through and including July 10, 2019.

54.  Under the circumstances of the emergency filing of this Chapter 11 case, SA respectfully submits that sufficient cause exists to extend the deadline to file the Schedules and Statements.  Completing the Schedules and Statements requires SA and its employees and advisors to spend considerable time and effort to collect, review, and assemble significant amounts of information.  Before the Petition Date, SA focused primarily on preparing the necessary pleadings to commence this case in less than a week.  Given the amount of work entailed in completing the Schedules and Statements, and the competing demands upon SA's personnel to address critical operational matters during the initial postpetition period, SA cannot properly and accurately complete the Schedules and Statements within the required 14-day period.

### B.  Cash Management Motion.

55.  SA requests authorization to continue to use its cash management system (the "Cash Management System"), perform ordinary course Intercompany Transactions (as defined below), and waive certain bank account and related requirements of the Office of the U.S. Trustee.  SA also requests that the Court grant any related relief to the foregoing.

56.  Additionally, SA requests that the Court authorize and direct JPMorgan Chase Bank ("Chase") to (i) continue to maintain, service, and administer SA's bank account at Chase, and (ii) debit the bank account in the ordinary course of business on account of (a) wire transfers or checks drawn on the bank account, provided that any payments drawn, issued, or made prior to the Petition Date shall not be honored absent direction of SA and a separate order of the

Court authorizing such prepetition payment and (b) undisputed service charges owed to Chase for maintenance of SA's Cash Management System, if any.

57.     The Cash Management System consists of one checking account in SA's name at Chase that enables SA to collect, transfer, and disburse cash (the "Debtor Bank Account"). SA currently does not generate any revenue, and thus the Debtor Bank Account is primarily used to make disbursements to employees, vendors, and on account of the Intercompany Transactions. To make such disbursements, SA almost exclusively utilizes wire and electronic transfers to disburse cash from the Debtor Bank Account.

58.     As the Debtor Bank Account is the only operating account that SA has, any disruption of the Cash Management System would have an immediate adverse effect on SA's business and operations to the detriment of its estate.  Accordingly, to minimize disruption caused by this Chapter 11 case and to maximize the value of SA's estate, SA requests authority to continue to utilize its existing Cash Management System during the pendency of this Chapter 11 case, subject to the terms of the Cash Management Motion.

59.     Further, SA's operations are dependent on UP LLC.  UP LLC performs critical support services, including management, oversight, and advisory services, to SA (the "Intercompany Transactions") at significant cost advantages and has institutional knowledge that cannot be easily replaced.  Prohibiting SA from honoring its obligations to UP LLC would create an unnecessary administrative burden on SA's estate.  Therefore, SA requests authority to continue to perform under and honor the Intercompany Transactions.

C.     **Wages Motion**

60.     SA requests authorization to, in its discretion, as deemed necessary to continue to operate and preserve value, (i) pay all prepetition wages, expense reimbursements, and

health care stipends (the "Prepetition Employee Obligations"); and (ii) honor and continue SA's

prepetition practices with respect to the Prepetition Employee Obligations in the ordinary course

of business.

61.     Any delay or failure to pay wages and other similar items would irreparably

impair employee morale, dedication, confidence, and cooperation and would adversely impact

SA's relationships with its employees at a time when its employees' support is critical to the

success of SA's Chapter 11 case. SA simply cannot risk the substantial damage to its business that

would result from any decline in employee morale.  Because SA's employees are paid on a

monthly basis, without the relief requested, the employees could suffer undue hardship and, in

many instances, serious financial difficulties, as some employees will likely need the amounts in

question to meet their own personal financial obligations and the stability of SA's workforce will

be undermined, perhaps irreparably, by the likelihood that SA will lose valued employees.

## IV.     INFORMATION REQUIRED BY LOCAL RULE 1007-2

62.     It is my understanding that Local Rule 1007-2 requires certain information

related to SA, which is set forth below.

63.     Local Bankruptcy Rule 1007-2(a)(2) is not applicable to SA's Chapter 11

case because it was not originally commenced as a Chapter 7, Chapter 12, or Chapter 13 case.

64.      As required under Local Bankruptcy Rule 1007-2(a)(3), Exhibit B lists the

names and addresses of the members of, and attorneys for, any committee organized prior to the

Petition Date and a brief description of the circumstances surrounding the formation of the

committee and the date of its formation. To the best of SA's knowledge and belief, no committee

has been organized prior to the Petition Date.

65.      As required under Local Bankruptcy Rule 1007-2(a)(4), Exhibit C lists the

following information with respect to each of the holders of SA's twenty largest unsecured claims

on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), telephone number, the name(s) of person(s) familiar with SA's accounts, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured. In each case, the claim amounts listed on Exhibit D are estimated and subject to verification. In addition, SA reserves its rights to assert remedies, defenses, counterclaims, and offsets with respect to each claim.

66.    As required under Local Bankruptcy Rule 1007-2(a)(5), Exhibit D lists the holders of the five largest secured claims against SA. As of the Petition Date, to the best of SA's knowledge and belief, there are no secured claims against SA.

67.    As required under Local Bankruptcy Rule 1007-2(a)(6), Exhibit E provides a summary of the unaudited assets and liabilities.

68.    As required under Local Bankruptcy Rule 1007-2(a)(7), Exhibit F provides the following information: the number and classes of shares of stock, debentures, and other securities of SA that are publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures, and other securities of SA that are held by SA's directors and officers, and the amounts so held. As of the Petition Date, SA does not have any publicly traded stock, debentures, or securities.

69.    As required under Local Bankruptcy Rule 1007-2(a)(8), Exhibit G provides a list of all of SA's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending. To the best of SA's knowledge and belief, none of its

24

property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for such entity.

70.     As required under Local Bankruptcy Rule 1007-2(a)(9), Exhibit H provides a list of the premises owned, leased, or held under other arrangement from which SA operates its business.

71.     As required under Local Bankruptcy Rule 1007-2(a)(10), Exhibit I provides the location of SA's substantial assets, and the location of its books and records.

72.     As required under Local Bankruptcy Rule 1007-2(a)(11), Exhibit J provides a list of actions against SA.

73.     As required under Local Bankruptcy Rule 1007-2(a)(12), Exhibit K provides a list of the names of the individuals who comprise SA's existing senior management, their tenure with SA, and a brief summary of their relevant responsibilities and experience. As of the Petition Date, SA does not have any existing senior management.

74.     As required under Local Bankruptcy Rule 1007-2(b)(1)-(2), Exhibit L provides the estimated amount to be paid to SA's employees (not including officers, directors, and stockholders), the estimated amount, on a consolidated basis, to be paid to SA's officers, stockholders, directors, and financial and business consultants retained by SA for the thirty (30) day period following the Petition Date.

75.     As required under Local Bankruptcy Rule 1007-2(b)(3), Exhibit M sets forth, for the thirty (30) day period following the Petition Date, estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remaining unpaid, other than professional fees, and other information relevant to the foregoing.

[*Signature Page Follows*]

25

Dated: May 27, 2019
       Miami, Florida

_____

Nicholas Singer
Authorized Person
Standard Amusements LLC

## Exhibit A

**Management Agreement**

# RESTATED AND AMENDED

# PLAYLAND MANAGEMENT AGREEMENT

# BETWEEN

# THE COUNTY OF WESTCHESTER

# AND

# STANDARD AMUSEMENTS LLC

**DATED: May 3, 2016**

**THIS RESTATED AND AMENDED PLAYLAND MANAGEMENT AGREEMENT** ("Agreement") made the 3rd day of May, 2016, by and between

> **THE COUNTY OF WESTCHESTER**, a municipal corporation of the State of New York, having an office and place of business in the Michaelian Office Building, 148 Martine Avenue, White Plains, New York 10601, acting by and through the Department of Parks, Recreation and Conservation, and/or the Department of Public Works and Transportation and/or the County Executive, as appropriate (hereinafter the "County"),

and

> **STANDARD AMUSEMENTS LLC** a for profit Delaware limited liability corporation having an office for the transaction of business at 767 Fifth Avenue, New York, New York 10153 (hereinafter referred to as "Manager").

The County and Manager hereinafter referred to collectively as the "Parties".

## W I T N E S S E T H:

**WHEREAS**, Playland Park is a public park located within the County of Westchester, in Rye, New York (hereinafter referred to as "Playland Park", "Playland" or the "Park"); and

**WHEREAS,** since 1928, the focal point of the property has been an Amusement Park, which today has 50 major rides and attractions. Playland also includes long stretches of scenic vistas of Long Island Sound, a beach, Olympic-sized pool, waterfront boardwalk, fishing piers, boating, dining and picnic areas, and indoor ice skating rinks; and

**WHEREAS**, there has been a downturn in attendance which has translated directly into greater County subsidies going to support the budget to operate Playland Park; and

**WHEREAS**, due to the current financial challenges facing local government now and for the foreseeable future, it has become necessary to develop creative solutions to continue the public's ability to enjoy the full potential of park resources; and

**WHEREAS**, in August 2010, in an effort to reverse the current financial conditions of Playland Park, the County issued a Request for Proposals ("RFP") seeking proposals for the management and operation of the existing Playland Amusement Park, in whole, in part, or some variation thereof; and

**WHEREAS**, the County's goal in seeking proposals to reinvent Playland Park was to maximize the potential for this valuable County resource, reduce Park expenses and to enter into a public/private partnership, similar to what other jurisdictions throughout New York State and the Country have done in agreements with not-for-profit and private corporations to take over management of a public park and raise private funds to operate the park and make improvements that the public owner cannot afford to do; and

**WHEREAS**, the County received 12 proposals in response to the RFP including a proposal from the Manager; and

**WHEREAS**, the County, by an agreement dated July 23, 2013 engaged Sustainable Playland, Inc. to manage and operate all of Playland Park, however, that agreement was terminated prior to its intended commencement date Sustainable Playland, Inc. never took over the management and operation of Playland Park and the agreement was terminated; and

**WHEREAS**, the County by an agreement dated August 21, 2014 engaged Playland Ice Casino, LLC to manage and operate the Playland Ice Casino ("Ice Casino"); and

**WHEREAS**, the County desires to engage Manager to manage and operate Playland Park; and

**WHEREAS**, the Westchester County Board of Legislators ("Board of Legislators") by Act 2015-100 approved on June 15, 2015 and approved by the County Executive on June 22, 2015, and the Board of Acquisition and Contract ("BAC") by resolution approved on June 18, 2015, authorized the County to enter into this Agreement with the Manager; and in addition, the Board of Legislators also approved two additional Acts, which were also approved by BAC on June 18, 2015, as follows:

(i)    Act No. 2015-98 authorizing the County to enter into a memorandum of understanding setting forth clarification of the terms and conditions set forth in the Playland Management Agreement with regard to the Five Year Capital Program for Playland, as it currently exists in the approved 2015 capital budget ("Capital MOU"); and

(ii)    Act No. 2015-99 authorizing the County to enter into a memorandum of understanding setting forth clarification of several terms and conditions set forth in the Playland Management Agreement ("PMA MOU"), and

**WHEREAS**, by letter dated October 16, 2015, the Manager was granted a five (5) month extension to March 31, 2016 of its option to terminate the Agreement in exchange for which the Manager paid the County $25,000.00 as a non-refundable payment; and the Board of Legislators by Act 2016-35 approved on March 30, 2016 and the BAC by resolution approved on March 31, 2016, authorized the County to amend this Agreement with the Manager in order to extend the date by which the Manager has to exercise its option to terminate the Playland Management Agreement through and including April 29, 2016, and also, the Board of Legislators by Act 2016-88 approved on April 18, 2016 and the BAC by resolution approved on April 21, 2016 authorized the County to amend this Agreement with the Manager in order to extend the date by which the Manager has to exercise its option to terminate the Playland Management Agreement through and including May 3, 2016; and

**WHEREAS**, the Parties desire to restate and amend this Agreement in its entirety as more particularly set forth herein.

**NOW, THEREFORE**, the Parties hereto in consideration of the terms and conditions herein contained agree that the Playland Management Agreement shall be restated and amended in its entirety as follows:

3

**SECTION 1:**     **Term; Co-Management Period; Initial Payments;**
                   **Commencement of Full Management of Playland Park**

A.     This Agreement shall take effect upon the date that it is fully executed by the County and Manager ("Agreement Commencement Date"). There shall be a period of co-management of Playland Park by the Parties which shall begin on the Agreement Commencement Date and shall end on the Management Commencement Date ("Co-Management Period"). The respective duties and responsibilities of the Parties during the Co-Management Period are described below.

Playland Park and the areas of Playland Park described herein, including, but not limited to, the amusement park, beach, pool, fountain plaza and boardwalk, are delineated in the attached drawing which is incorporated herein as **Schedule "A"** and in the attached survey which is incorporated herein as **Schedule "A-1"**. The County shall remain responsible for Manursing Lake, the tidal gate by the Isthmus, and Edith G. Read Natural Wildlife Park and Sanctuary noting that these areas are not part of Playland Park. Notwithstanding anything to the contrary in this Agreement, the Manager acknowledges and agrees that the County shall have access to these areas at all times and for any reason whatsoever.

B.     The Parties have entered into a separate escrow agreement, which provides that the County Executive shall submit legislation (the "Legislation") to the Board of Legislators seeking approval of this Agreement. The Legislation shall be reasonably acceptable to the Manager. The terms of that escrow agreement include, but are not limited to, the following:

The Manager shall place $250,000 into escrow upon the execution of the escrow agreement. The escrow will be held by an independent escrow agent acceptable to the County and the Manager.

If the Board of Legislators does not approve and adopt the Legislation within sixty (60) days of its submission to the Board of Legislators, then the Manager shall direct the escrow agent to pay the County $50,000 from the escrow, direct the escrow agent to pay the Manager $200,000 from the escrow, terminate the escrow agreement and terminate its offer to the County to enter into this Agreement.

If the Board of Legislators approves the Legislation within sixty (60) days of its submission to the Board of Legislators, then the Manager shall place an additional $250,000 into escrow, for a total amount of $500,000 to be held by the escrow agent and upon the delivery to the escrow agent of (i) a copy of the resolution of the BAC of the County authorizing the County to enter into this Agreement and (ii) a copy of this Agreement (with any modifications accepted by the Manager and the County), fully executed by the Manager and the County, the escrow agent shall pay the $500,000 held in escrow to the County on the Agreement Commencement Date (the "First Initial Payment").

The Parties acknowledge that the above conditions have been satisfied and the First Initial Payment has been made and is non-refundable.

C.     The County Executive submitted to the Board of Legislators a number of legislative packages which seek authority to amend the County's 2016 Capital Budget and/or

4

also seek bond act authorization, in connection with various capital projects to be undertaken at Playland. A list of the projects submitted is attached hereto as **Schedule "K".** ("The Schedule "K" Capital Projects") The Parties agree that as long as the legislation for The Schedule "K" Capital Projects has been adopted by the Board of Legislators by May 3, 2016 and within 7 days thereafter such authorization, or a summary thereof, shall have been published with a 20-day Estoppel Notice in accordance with Section 81.00 of the Local Finance Law, and no litigation is filed challenging such bond authorizations within such 20-day period, then the Manager, on June 15, 2016, shall make an additional payment to the County ("Second Initial Payment" and together with the First Initial Payment, the "Initial Payments"). The Second Initial Payment shall be in the amount of One Million Seven Hundred and Fifty Thousand ($1,750,000.00) Dollars, of which Two Hundred and Fifty Thousand ($250,000.00) Dollars shall be paid to the County as a non-refundable payment, and One Million Five Hundred Thousand ($1,500,000.00) Dollars shall be held by the County in a special reserve account established by the County. In the event the Manager does not make the $1,500,000 payment to the County on June 15, 2016, this Agreement shall terminate unless a later payment date is mutually agreed to by the County and the Manager.

The County must enter into an agreement with an engineering firm for The Schedule "K" Capital Projects by July 31, 2016. Provided, however, if the engineering agreement is not executed by July 31, 2016, and the County is diligently pursuing execution of the engineering agreement, then the County shall be entitled to a one-time thirty-one (31) day grace period in which to execute the engineering agreement which will expire on August 31, 2016. If the engineering agreement is not executed within the time periods specified above as applicable, the County will return the $1,500,000 held in the special reserve account to the Manager, the County will refund to the Manager the Manager's Investment (as defined in Section 3(D) hereof) made on or after May 1, 2016 through the date of termination and this Agreement will terminate. Notwithstanding the foregoing, at the Manager's sole option, the Manager may extend in writing the required execution date of the engineering agreement for up to three (3) consecutive sixty (60) day extensions, during such extension period the County will retain the $1,500,000 in the special reserve account provided, however, if the engineering contract has not been executed by July 31, 2016, or if applicable August 31, 2016, or if applicable the conclusion of the final extension period permitted by the Manager, the County will promptly return to the Manager the $1,500,000 held in such special reserve on July 31, 2016, or if applicable August 31, 2016, or if applicable the expiration of the final extension period permitted by the Manager and this Agreement will terminate.

The Manager will have the opportunity to review the engineering agreement and the engineering firm must be approved by the Manager whose consent cannot be unreasonably withheld, conditioned or delayed. The Manager must approve or disapprove the engineering firm within ten (10) business days of the County's notification and delivery of the engineering agreement to the Manager. If the Manager disapproves of the engineering firm, then the County will have ten (10) business days to propose an alternative engineering firm. If the County does not propose an alternative engineering firm in ten (10) business days or if the Manager disapproves of the second proposed firm, then the Manager has the option to terminate this Agreement and the $1,500,000 held in the special reserve account will be returned by the County to the Manager and the County will refund to the Manager the Manager's Investment made on or after May 1, 2016 through the date of termination. However, notwithstanding the foregoing, the County shall use its commercially reasonable efforts to appoint another engineering firm.

5

The Parties will use best efforts to mutually agree upon a construction schedule for the work to be undertaken related to The Schedule "K" Capital Projects by September 30, 2016. Provided, however, if the County is diligently pursuing same, then the County shall be entitled to a one-time thirty-one (31) day grace period which will expire on October 31, 2016 to agree upon a construction schedule. Notwithstanding the foregoing, the Manager may, at its sole option, extend in writing, the required delivery date of the construction schedule for up to three (3) consecutive sixty (60) day extension periods.  If the Parties cannot mutually agree to a construction schedule for The Schedule "K" Capital Projects within the time periods specified above, or a later date agreed to by the Manager described above, the Parties will hire a third party mutually agreeable to both Parties with expertise in project scheduling and coordination to prepare a construction schedule for the Parties.  The cost of the expert will be shared equally by the Parties.  If the Parties cannot agree on the third party with expertise in project scheduling, the engineer hired for The Schedule "K" Capital Projects will designate the third party expert to prepare the construction schedule.  If the construction schedule is not determined by September 30, 2016, or October 31, 2016, in the event the one-time grace period applies or a subsequent date agreed to by the Manager as described above, the Manager may terminate this Agreement and upon such termination, the County will return to the Manager the $1,500,000 held in the special reserve account and the County will refund to the Manager the Manager's Investment made on or after May 1, 2016 through the date of termination.  If the construction schedule is determined by September 30, 2016 or October 31, 2016, in the event the one-time grace period applies, or a subsequent date agreed to by the Manager described above, then $750,000 of the $1,500,000 held in the special reserve account will be paid to the County as a non-refundable payment.

The Manager shall commence full management and operation of Playland Park on the November 1st ("Management Commencement Date") following the point in time that fifty (50%) percent of the total capital bonding amount approved by the Board of Legislators for The Schedule "K" Capital Projects has been expended for the Schedule "K" Capital Projects ("50% Threshold").

The term of this Agreement shall be for a period consisting of the Co-Management Period and thirty (30) years from the Management Commencement Date ("Term").

Prior to June 1, 2017 season, the Manager shall expend at least Five Million ($5,000,000.00) Dollars of its Manager's Investment, as that term is defined in Section 3(D) below, on engineering, overhead, new rides or other tangible improvements, of which Three Million ($3,000,000.00) Dollars will be spent on new rides or other tangible improvements which will be available for public use and enjoyment.  The remaining Two Million ($2,000,000.00) Dollars will be spent towards any of the items listed on **Schedule "C-1"** attached hereto and made a part hereof.

All funds spent by the Manager after May 1, 2016 will count towards the Manager's Investment, as that term is defined in Section 3(D) below.  For all purposes of this Section 1(C), the Manager's Investment shall not include the Initial Payments.

The County shall provide monthly reports to the Manager that delineate all funds spent by the County with respect to the Schedule "K" Capital Projects which shall include approved

6

contractor invoices for such expenditures. Such monthly reports shall be provided to the Manager on or before the last day of the month following the month to which such monthly report relates, except that the first and second of such reports shall be delivered by the Manager on or before July 31, 2016.

If the above 50% Threshold is not satisfied by December 31, 2017, but the County is diligently pursuing same, then the County shall have a one-time thirty-one (31) day grace period expiring January 31, 2018 to satisfy the 50% Threshold. If the 50% Threshold is not satisfied within the time period specified above, then the Manager shall have the option to terminate this Agreement or the Manager, at its sole option, may extend the completion date for the 50% Threshold for up to three (3) consecutive one-year extension periods measured from December 31, 2017 or January 31, 2018 as the case may be. In the event the 50% Threshold is satisfied by December 31, 2017, January 31, 2018, if applicable, or by the conclusion of the final extension period permitted by the Manager, then upon satisfying the 50% Threshold the remaining $750,000 held in the special reserve account will be paid to the County as a non-refundable payment. In the event the 50% Threshold is not satisfied by December 31, 2017, January 31, 2018, if applicable, or by the conclusion of the final extension period permitted by the Manager, the Manager may terminate this Agreement. In the event this Agreement is terminated as a result of this provision, the Manager's Investment made on or after May 1, 2016 through the date of termination will be promptly refunded by the County to the Manager, and in addition, the County will promptly return to the Manager the $750,000 held in the special reserve.

Any payment by the County to the Manager of the amounts held in the special reserve fund pursuant to the provisions of this Section 1(C) shall not be subject to the provisions of Section 13 hereof and shall be made within thirty (30) days of the termination of this Agreement. If any payments due from the County under this Section 1(C) or under Section 2(C) hereof are not made within sixty (60) days after the termination by the Manager hereof, such unpaid amount shall bear interest at the Default Rate. "Default Rate" means the rate of interest which is three percent (3%) over the prime rate of interest as published daily in the Wall Street Journal. The Default Rate shall be computed separately for each month, or any part thereof, during which any amount upon which interest is to be charged hereunder remains unpaid hereunder.

If ninety (90%) percent of the total capital bonding amount approved by the Board of Legislators for The Schedule "K" Capital Projects ("90% Threshold") has not been expended by December 31, 2018, but the County is diligently pursuing same, then the County shall have a one-time thirty-one (31) day grace period expiring January 31, 2019 to satisfy the 90% Threshold. If the 90% Threshold is not satisfied within the time period specified above, then the Manager shall have the option to terminate this Agreement or the Manager, at its sole option, may extend the completion date for the 90% Threshold for up to three (3) one-year extension periods measured from December 31, 2018, or January 31, 2019 as the case may be. In the event the 90% Threshold is not satisfied by December 31, 2018, January 31, 2019 if applicable, or by the conclusion of the final extension period permitted by the Manager, the Manager may terminate this Agreement. In the event this Agreement is terminated as a result of this provision, the Manager's Investment made up until the date of termination will be promptly refunded by the County to the Manager. This does not include the First Initial Payment or Second Initial Payment.

D.     During the Co-Management Period, the County shall be the sole decision maker and continue to manage, operate, repair, maintain, make improvements to and have financial responsibility for costs and liabilities for Playland.  During the Co-Management Period, the Manager shall assign the requisite number of personnel and/or consultants hired by the Manager to monitor County personnel, study Playland's operations, and take all steps necessary to complete its due diligence to prepare to take over the full management and operation of Playland Park with the Manager's personnel on the Management Commencement Date.  The Parties agree to make commercially reasonable efforts to cooperate with each other during this Co-Management Period to ensure the continuity of operations at Playland.

E.     During the Co-Management Period, the Parties shall create a schedule of items to be completed in order to transition full management and operation of Playland Park to the Manager.  The items shall include, but are not limited to:

(i)     examination of the existing infrastructure and equipment, including the County's Point of Sale system;

(ii)    the County shall prepare a list of all contracts, licenses and other agreements that it currently has, which are used in the operation of Playland Park and present same to the Manager within thirty (30) days after the Agreement Commencement Date for the Parties to review to determine which, if any, such contracts including, but not limited to, software licenses, will, if possible, either be assigned to the Manager for the remaining term of such contract or terminated by the County upon its terms and conditions.

If the Manager and the County mutually agree to the assignment of the contract and such contract is assigned to the Manager, the Manager shall be responsible to carry out the terms of that contract until it terminates.  Upon the expiration or termination of any County contract, the Manager shall perform such services or will be responsible to enter into agreements for the same or similar purposes at its cost and expense.  The following are exceptions to this provision:

a.     The license with 181 New England Seafood Corporation-Tiki Bar/Pier Restaurant ("Tiki Bar") shall continue until it expires on December 31, 2019.  Prior to expiration, the County will conduct a request for proposal process with respect to this license and the Manager shall be permitted to submit a proposal in response to this request for proposal;

b.     The license with New York SMSA Limited Partnership d/b/a Verizon Wireless, its successors or assigns, for microcell, rerad, or other similar or comparable in-building radio-distribution devices will not be assigned or terminated and will continue as a County contract unless otherwise agreed to by the Parties in writing in an amendment to this Agreement;

c.     The County and the Manager shall mutually agree as to the specific terms of the assignment of the County's contract with Playland Ice Casino LLC, to ensure a smooth transition;

8

d.    The Manager agrees that it shall be subject to the existing and future County Parks contract for soda/water pouring rights and that any of its subcontractors shall also remain subject to such agreement(s). Commencing in 2016, the County shall include in future pouring rights contracts that include Playland the following language: "Pricing shall be uniform among all County park facilities", in addition, not less than fifteen (15) business days prior to the County's execution of any future pouring rights agreement, the County will deliver a copy of such proposed agreement to the Manager for review and the County will consider the Manager's comments to such agreement, but under no circumstance will the County be obligated to make any revisions;

e.    The County's existing contract for automated teller machines ("ATMs") at Playland Park and other parks expires on April 17, 2017. The Manager agrees that it shall be subject to the existing ATM contract until it expires and upon expiration, the Manager, at its cost and expense, shall have an affirmative obligation to enter into an agreement for these purposes and the right to retain any fees;

f.    The Parties agree that the following County residences are for use by the County in its discretion, but on the condition that they are used for Playland purposes only, and any license fees collected by the County for these residences shall remain County revenue: (i) Residence at East Lake Boathouse and (ii) Residence at 45 Roosevelt Avenue.

With respect to the Residence located at West Lake Boathouse, the Parties agree that the Manager shall have a right of first refusal to use this residence, and on the condition that the Manager shall only use this residence for Playland purposes. The Manager shall, within thirty (30) days of receipt of an offer from the County to use this residence, provide the County with written notice indicating whether it intends to use the residence or whether it is waiving its right of first refusal. In the event the Manager opts to use the residence, then the Manager shall pay the County a license fee equal to the current market value of $1,175 per month for the first full year starting on the Management Commencement Date. This license fee shall be re-evaluated and re-set every five years at the appraised market value. In the event the Manager waives its right of first refusal, the County shall thereafter have the use of the residence in its discretion, but on the condition that the residence is used for Playland purposes only. Any license fee collected by the County for this residence shall remain County revenue. The right of first refusal shall become operative each time the County seeks to enter into a new agreement for this residence. Any agreement that the County enters into for the use of this residence shall be no longer than three (3) years in term; and

g.    The Parties agree, except as noted above, that the County shall have the right to retain all fees paid to the County pursuant to any such contracts,

and to maintain these contracts and any successor contracts for the Term of this Agreement, at no cost to Manager.

(iii)    develop all plans, rules and regulations as required by Section 5 below; and

(iv)    create a list of County-owned items of personal property and equipment located at Playland Park to be transferred to the Manager for its use solely for Playland Park operations, which shall be attached hereto as **Schedule "B"** prior to the Management Commencement Date and if it is later determined that any item is not required for its use, the Manager shall return same to the County.

F.    During the Co-Management Period, the County shall provide the Manager with appropriate office space necessary to carry out its duties.

**SECTION 2:**    **Management of Playland Park**

Starting on the Management Commencement Date:

A.    In accordance with the terms and conditions of this Agreement, Manager, at its sole cost and expense, shall manage, operate, improve, maintain and repair Playland Park in accordance with standard industry practices and shall in due course of daily management make all repairs to the grounds, walkways, paved areas, facilities, buildings, structures, equipment, rides and other infrastructure at Playland Park, except for the County's responsibilities set forth in Sections 2-a and 12 below; and to also make restorations, renovations and improvements to Playland Park as outlined in **Schedule "C-1"**, and any other work more particularly set forth in this Agreement (collectively the "Work").

In addition, the Manager shall be responsible to obtain and/or acquire all supplies, materials, accessories and equipment necessary to operate Playland Park. Notwithstanding the above, the Manager shall not be responsible to manage and operate the Ice Casino (except to the extent required if the County's license with the Ice Casino Manager is assigned to the Manager hereunder), the Tiki Bar, or the Westchester Children's Museum.

The County covenants and agrees that it shall not, by itself or through a third party, take any action or permit any action to be taken which permits any portion of Playland Park not managed by the Manager under this Agreement, to be utilized for activities that will compete or interfere with any of the activities undertaken by the Manager at Playland Park. The foregoing provision shall not limit the County's existing arrangements with the Tiki Bar, the Ice Casino or the Westchester County Children's Museum, nor shall this provision in any way limit the existing park activities at Edith G. Read Natural Wildlife Park and Sanctuary.

The County hereby grants to Manager the exclusive right and privilege to undertake the Work during the term of this Agreement. The Manager recognizes and understands that it must manage and operate Playland Park consistent with its current recreational uses and as a public park facility. Provided the County has fully satisfied its obligations under this Agreement, the

Manager shall complete all of the items identified in **Schedule "C-1"** within five (5) years of the Management Commencement Date.

B.     During normal business hours the County, its employees, agents and independent contractors shall have access to all of Playland Park at all reasonable times during the Term of this Agreement to carry out the County's responsibilities under this Agreement without materially disturbing Manager's business operations, in accordance with agreed to protocols for ordinary day-to-day activities and with reasonable notice and cooperative planning for major repairs or capital improvements, except if an emergency situation requires immediate action by the County, whether during business hours or not, then the Manager shall  be notified within a reasonable time after the emergency occurs, if the Manager did not notify the County of the emergency.  Manager shall provide a set of keys or access codes for any locks to the County for these purposes.

C.     The Manager, either by itself or through an approved subcontractor, shall use commercially reasonable efforts to ensure that Playland Park shall be operational during the period commencing with the Management Commencement Date and ending on the expiration or earlier termination of this Agreement.  It is also recognized and understood by the Parties that the operation of an amusement park, the beach area and the pool areas are material elements of this Agreement, provided, however, the future use of the pool area is subject to the following paragraph.

Notwithstanding any other provision of this Agreement to the contrary, the Board of Legislators shall determine by July 31, 2016 either to replace the pool or close and demolish or fill the pool and any costs associated with such replacement or demolition and filling and closure shall be the sole responsibility of the County.  In furtherance of the replacement or demolition or filling and closure of the pool, the County Executive will cause associated legislation to be promptly submitted to the Board of Legislators for their review and approval.  Any County capital budget amendment and/or bonding authorization necessary to carry out the replacement or demolition or filling and closure shall be authorized by the County no later than July 31, 2016 and any such replacement or demolition or filling and closure shall be incorporated into the Schedule "K" Capital Projects by July 31, 2016.  If the decision is made to replace the pool, upon final completion of the pool by the County, the Manager shall take over operation of the pool in accordance with the terms of this Agreement.  If the County demolishes or fills and closes the pool, the County will undertake to have the pool filled with load bearing material or have the pool area backfilled with compacted soil to grade, and thereafter the Manager shall have right to repurpose the pool area, at Manager's sole cost and expense.

In the event legislation is not adopted by the Board of Legislators by July 31, 2016, to either replace or demolish or fill and close the pool, or the Board of Legislators has not fully funded the replacement or demolition or filling and closure of the pool by July 31, 2016, then the Manager may terminate this Agreement and upon such termination, the County will return the $1,500,000 held in the special reserve account to the Manager and the County will refund to the Manager the Manager's Investment made up until the date of termination.  The Manager's Investment shall not include the Initial Payments.

In addition, the Manager shall keep all currently non-gated public spaces at Playland Park maintained and open to the public which are described below with "in-season" defined as the time period when the amusement park and the beach areas are operational (as determined by the Manager's operating schedules approved pursuant to the annual Operating Plan described in Section 4 below), and "off-season" as the time period when the amusement park and the beach areas are not in operation (as determined by the Manager's operating schedules approved pursuant to the annual Operating Plan described in Section 4 below):

All public areas beginning immediately east of Forest Avenue, including:

- East of Forest Avenue through the top circle, inclusive of all property down to the entrance circle (year-round during any hours for Ice Casino and Children's Museum operations or dawn to dusk off-season; dawn to park closing in-season);

- Employee Parking Lot/Bus Depot (year-round during any hours for Ice Casino and Children's Museum operations or dawn to dusk off-season; dawn to park closing in-season);

- Main Parking Lot (year-round during any hours for Ice Casino and Children's Museum operation or dawn to dusk off-season; dawn to park closing in-season);

- Beach/Pool Parking Lot (year-round during any hours for Ice Casino and Children's Museum operations or dawn to dusk off-season; dawn to park closing in-season);

- Fountain Plaza (year-round during any hours for Ice Casino and Children's Museum operations or dawn to dusk off-season; dawn to park closing in-season);

- Main Boardwalk from Rye Town Park to Tiki Bar area and Seaside Walk entrance (dawn to dusk off-season; dawn to park closing in-season);

- Beach (dawn to dusk off-season for dog walkers with off-leash dogs; beach operations 10 a.m./beach closing in-season);

- Pier (dawn to dusk off-season; dawn to park closing in-season);

- Tiki Bar/Restaurant (10 a.m. up to 2 a.m. April through October);

- Seaside Walk from the back of the Ice Casino including the to be reconstructed North Boardwalk (dawn to dusk off-season; dawn to park closing in-season);

- Public Picnic Area/Lake Perimeter/Boathouse (dawn to dusk off-season; dawn to park closing in-season); and

- Roadway/property and additional parking past the Music Tower leading to Edith G. Read Natural Wildlife Park and Sanctuary entrance (dawn to dusk off-season; dawn to park closing in-season).

The duty of the Manager to keep the public areas open shall be subject to Force Majeure as defined in Section 39.

In accordance with the RFP, it is recognized and understood by the Manager that the public must be guaranteed free access to Edith G. Read Natural Wildlife Park and Sanctuary and to the boardwalk and pier. The Manager shall also guarantee public access to the beach, provided that the Manager may establish fees for such public access as is presently required consistent with the fees set pursuant to Section 4 herein and with the policies adopted pursuant to Section 5 herein.

D.      All of the Work shall be carried out in conformity with all applicable federal, state and local laws, rules and regulations, orders and ordinances and other legal requirements, including, but not limited to, all applicable rules and regulations of the Department of Parks, Recreation and Conservation.

E.      The Manager shall perform all the Work in a good and workmanlike manner in order to keep Playland Park in a clean, orderly, safe and operational condition. The Manager shall use commercially reasonable efforts to keep all grounds, sidewalks, streets, curbs, parking areas, access roads and roadways free of snow, ice, dirt, rubbish and other obstacles.

F.      The Manager agrees that it shall be subject to the existing and future County Parks contract for solid waste removal at Playland Park and that any of its subcontractors shall also remain subject to such agreement. The Manager may, however, choose to provide solid waste removal services at Playland Park through its own contract for these services. This option may be exercised by the Manager in writing to the Commissioner of the Department of Parks, Recreation and Conservation (the "Commissioner") either thirty (30) days before the Management Commencement Date or thirty (30) days before the expiration of the County's current contract for solid waste removal services which is May 7, 2018. In the event the Manager provides solid waste removal services, the Manager will be permitted to utilize the same transfer station or refuse disposal facility as that used by the County and will pay a tipping rate or disposal fee no greater than what the County pays for disposal. If the Manager does not provide such notice to the County, then the Manager shall continue to receive the solid waste removal services and shall reimburse the County the portion of the solid waste removal fees for Playland Park. The Manager shall not be responsible to pay for solid waste removal services that are provided to the Ice Casino, the Tiki Bar or the Westchester Children's Museum.

With respect to future contracts for solid waste removal at Playland Park, the County shall notify the Manager sixty (60) days before it issues a bid for these services and Manager shall respond within thirty (30) days indicating whether or not the Manager wants to continue to receive solid waste removal services under the County's contract for said services.

In addition, the Manager shall provide for, or cause to be provided by its subcontractors, the following services: grease removal, fumigation, disinfecting and deodorizing services, and provide at least monthly professional extermination services. The Manager, at its sole cost and expense, shall comply with all County recycling policies.

13

G.     In furtherance of Operating Plan required by Section 4 below and the Rules and Regulations and Plans required by Section 5 below, the Manager shall expeditiously develop policies and procedures for the operation and management of Playland Park.

H.     In order to carry out the Security and Emergency and Contingency Plan required by Section 5 below, the Manager shall ensure that there are appropriate safety, security, emergency and fire response systems, including equipment and personnel, necessary to protect both persons and property prior to the Management Commencement Date. Provided, however, that the Manager shall not be responsible for any liability resulting from any existing hazardous conditions known to the County.

In furtherance of the above, the Manager shall be responsible at its sole cost and expense to provide security guard services, which shall include, but is not limited to, all security functions, daily supervision, staffing, operation of security equipment and emergency procedures. In addition to the security guard services to be provided by Manager, the Manager agrees to pay the County for police and park ranger staffing and services to be provided by the Westchester County Department of Public Safety Services at a level equivalent to the level of police and park ranger staffing and services that the County provided at Playland Park prior to the Management Commencement Date.

Payment by the Manager for police and park ranger staffing and services shall be made on a calendar year basis on August 31st of each year commencing with the August 31st immediately succeeding the Management Commencement Date. Until the date that the County shall have expended Seventy Percent (70%) of the total capital bonding amount approved by the Board of Legislators for Schedule "K" Capital Projects, the annual fee payable by the Manager on each August 31st shall equal Four Hundred Thousand Dollars ($400,000.00). After the date that the County shall have expended Seventy Percent (70%) of the total capital bonding amount approved by the Board of Legislators for Schedule "K" Capital Projects, the annual fee payable by the Manager on each August 31st shall equal Six Hundred Thousand Dollars ($600,000.00). The amount due hereunder for the year in which the County has expended Seventy Percent (70%) of the total capital bonding amount approved by the Board of Legislators for Schedule "K" Capital Projects shall be prorated based upon the date when such 70% threshold was achieved by the County.

The amount to be paid for these police and park ranger staffing services shall increase each year after the second anniversary of the Management Commencement Date in an amount equal to the increase in percentage of salary provided for in the applicable collective bargaining agreement for these employees. If the Manager requests an increase in police and park ranger staffing services over the level of police and park ranger staffing services that the County provided prior to the Management Commencement Date, the County and Manager shall discuss the details of the requested additional police and park ranger staffing services and the Manager shall pay an additional fee for these police and park ranger staffing services over and above the stated fee, provided that such additional fee shall be proportionate to the additional services provided and in no event be ratably more than the cost of such additional police and park ranger staffing services.

I.      The Manager shall not create, nor suffer to be created, any nuisance in, around or about Playland Park.

J.      The Manager shall provide such other facilities, services and activities as necessary to undertake the Work.

K.      The County shall continue to provide bus service to Playland and the Manager shall not incur any expense in connection with the provision of this routine bus service. However, if the Manager requests an increase in services over the level of bus services that the County provided prior to the Management Commencement Date, the Parties shall discuss the details of the requested additional services and the Manager shall pay a reasonable fee for these additional services.

L.      The County Executive, and the departments under the administrative jurisdiction of the County Executive, and the Manager agree that they shall use best efforts to cooperate with each other to permit the Manager to carry out the Work.

M.      The Manager shall use commercially reasonable efforts, in the exercise of the Manager's best judgment, to carry out the Work in a manner, which is compatible with the interests of the County and the Manager, Playland Park as a public park, the community surrounding Playland and the users of Playland Park.

N.      The Manager shall have no liability for failure to perform its obligations under this Agreement to the extent, but only to the extent, that it is unable to perform by reason of either:

(i)     the failure of the County to provide any approval required under this Agreement and reasonably requested by the Manager as set forth in subparagraph W below, or the failure of any local, County, State or federal entity to provide any requisite permit or consent for any of the Work required under this Agreement, or

(ii)    the failure or refusal of the County to approve budgetary appropriations (or obtain funding from other sources) required by this Agreement, or

(iii)   the default by a third party not under the direction or control of the Manager, or

(iv)    Force Majeure as defined in Section 39.

O.      The Manager or its designee shall attend quarterly meetings with County personnel at mutually agreeable times and locations.

P.      The Manager shall cooperate and assist the County in dealing with all federal, state and local agencies in all matters relating to the Work.

Q.      The Manager shall provide technical advice within the knowledge of Manager to the County on Playland Park operations, maintenance and marketing programs and projects. The prior sentence notwithstanding, the Manager shall have no obligation to seek such advice from

outside experts or consultants when the advice requested by the County is outside the knowledge of Manager.

R.     The Manager shall provide written documentation of all accidents that take place at Playland Park where such accidents result in the occurrence of any of the following: (i) administration of first aid by the Manager; (ii) require a response by public safety services (Police/EMS/Fire); (iii) require a response by Manager's internal security service; or (iv) where such accidents are reported by a third party to the Manager.  The Manager shall notify the County's Director of Risk Management within 24 hours of such accident by providing written documentation in a format acceptable to the Director of Risk Management.

S.     The County shall have the option to select and use appropriate space in the Administration Building and/or at one or more other buildings within Playland Park for use as office space, police facilities, information technology, filing and storage of documents or other purposes deemed necessary or desirable to the County. Such space shall be in a location that is mutually acceptable to both Parties.

T.     The Manager may maintain its own designated website for Playland Park.  If the Commissioner finds any website content to be clearly defamatory or offensive to the reasonable standards of the community, then the Commissioner shall request a modification to the website which request shall not be unreasonably withheld, conditioned or delayed by the Manager.  The County's website shall include a link to the Manager's website.

U.     The Manager shall consider incorporating a water dependent boating component with docks and moorings (a "Marina") into the vision for the future of Playland in accordance with the resolution dated December 19, 2012 adopted by the City Council of the City of Rye provided the operation of a Marina is determined to be reasonably feasible, financially viable and a net revenue generator on a continuing basis.

V.     The Manager shall provide evidence to the County that the Amusement Park within Playland Park is in compliance with ASTM F-24 standards.

W.     The Manager, if necessary, shall comply with the provisions of Section 765.351 et seq. of the Laws of Westchester County ("the County Tree Law").

X.     The Manager shall use its commercially reasonable efforts, in the Manager's sole judgment reasonably exercised, to attract desirable subcontractors consistent with the Manager's response to the County's RFP.

Y.     Each approval, pursuant to or necessitated by the terms of this Agreement, of the Commissioner, or any other County commissioner or department under the administrative jurisdiction of the County Executive, shall not be unreasonably withheld, conditioned, or delayed.

Z.     The Manager, with the approval of the Commissioner which approval shall not be unreasonably withheld, conditioned or delayed, may utilize a portion of the parking lot during the off-season for other temporary attractions, provided that it does not interfere with the general

operations of Playland Park, the operations of the Ice Casino and/or the operations of the Children's Museum.

AA.     The Manager shall use commercially reasonable efforts, consistent with the proper maintenance and operation of the Playland Park, availability of funds and the safety of the public, to conserve water and electricity and to implement commercially reasonable conservation programs and to otherwise follow commercially reasonable practices for energy conservation to the extent practicable.

BB.     It is a material element of this Agreement that the Manager utilize professional management in operating Playland Park, in particular the services of Jacob T. "Jack" Falfas who shall be deemed one of the Key Personnel under this Agreement. The Manager shall provide the County with a list of Key Personnel prior to the Management Commencement Date, which shall be attached hereto as **Schedule "D".** No replacement shall be made to Key Personnel until the Manager notifies the Commissioner in writing that the replacement has similar or better qualifications than the incumbent. On or before the Management Commencement Date and provided the same is available on a commercially reasonable basis, the Manager shall purchase "Key Person" Insurance for the benefit of the Manager.

## SECTION 2-a:       County's Duties for Maintenance and Repairs and Improvements

The County as owner of Playland Park shall remain responsible for extraordinary maintenance, repairs and improvements, which are those that occur infrequently, are substantial and increase the economic life of the asset. For example: maintenance, repair, or replacement of sewer mains, electrical feeders, major structural components of buildings, re-pavement of parking lot when necessary and the remediation of any hazardous conditions relating to the same, as long as such hazardous conditions is not caused by the Manager; except for those restorations, renovations and improvements to Playland Park as outlined in **Schedule "C-1"** which the Manager shall be responsible for and also for any new restorations, renovations and improvements to Playland Park to be undertaken by the Manager in the future.

## SECTION 2-b:       PMA MOU

1. The Manager will not undertake development of sport fields in the Parking lot.

2. The Manager will provide the Committee as designated by the Chairman of the Board of Legislators, quarterly financial information relating to the Manager, within sixty (60) days of the end of each fiscal quarter of the Manager. The Parties agree that the information submitted by the Manager may contain confidential financial information, trade secrets or other proprietary data or information (collectively the "Confidential Information") which if disclosed to the public could cause substantial injury to the Manager. The Manager agrees to insert the following notice in its Confidential Information that the Manager reasonably believes is not subject to disclosure under the New York State Freedom of Information Law, as set forth in Public Officers Law, Article 6, Sections 84-90: "The Manager believes that this

information is protected from disclosure under the State Freedom of Information Law. The data contained herein provides financial information constituting trade secrets or information the disclosure of which would result in substantial injury to the Manager."

The Committee designated by the Chairman of Board of Legislators, agrees that any Confidential Information designated with the above statement will be kept confidential, except with the specific prior written consent of the Manager. Notwithstanding anything to the contrary contained herein, the Manager expressly acknowledges that the County is subject to public disclosure laws and that this Memorandum of Understanding and the information provided by the Manager to the County in connection herewith, may be subject to disclosure pursuant to Federal, State and/or Local public information laws or regulations (e.g., New York State Freedom of Information Law, as set forth in Public Officers Law, Article 6, Sections 84-90, which mandates public access to government records). To the extent consistent with its public records, laws, and statutorily required disclosure, the County shall use best efforts to maintain the confidentiality of all Confidential Information supplied by the Manager and identified by the Manager as Confidential Information. If a request is made to view the Manager's Confidential Information and such request is statutorily permitted, the County will notify the Manager of the request and of the date that such Confidential Information will be released, and the County, in its discretion, may seek a Court Order enjoining that disclosure. The County will release the requested Confidential Information on the date previously specified absent receipt of any such order.

3. During the seasonal period of operation of Playland Park, commencing May 1st and ending September 30th of each year, the Manager will provide to the Committee designated by the Chairman of the Board of Legislators, monthly operating statistics relating to attendance levels and revenue at Playland Park within 30 days of the end of each such month.

4. The Parties acknowledge that the Manager, will consult and meet with an Advisory Committee at a minimum on a quarterly basis. Committee members may be selected from, but not be limited to the following: Westchester County Historical Society, Save the Sound, City of Rye, Edith G Read Nature Sanctuary, Rye Historical Society, Children's Museum, Rye Town Park Commission or similar groups. Manager agrees to appoint such members to the Advisory Committee beginning in July 2016.

5. The Manager acknowledges that there are issues of mutual concern between the Manager and the City of Rye. The Manager agrees to act in good faith in discussing and negotiating these issues with the City.


**SECTION 3:**      **Compensation**

A.      **Initial Payments**:      Initial Payments are those payments defined in Section 1 above which total Two Million Two Hundred and Fifty Thousand ($2,250,000) Dollars.

B.   **Annual Management Fee**:  Beginning with the first August 31st immediately succeeding the date that seventy (70%) percent of the <u>total</u> capital bonding amount approved by the Board of Legislators has been expended for The Schedule "K" Capital Projects, and on each August 31st thereafter until the termination or expiration hereof, the Manager shall pay to the County a management fee ("Annual Management Fee").  The first year's Annual Management Fee shall be Three Hundred Thousand ($300,000.00) Dollars.  The amount of the second Annual Management Fee shall be increased by the greater of (i) two (2%) percent or (ii) the change in the Consumer Price Index for All Urban Consumers (CPI-U) for New York-Northeastern New Jersey during the preceding twelve (12) month period ending September 30th.  In the event that the Bureau of Labor Statistics revises the standard reference base period or if a change occurs in the structure of the index, the Parties agree to use the applicable conversion factors supplied by the Bureau of Labor Statistics to convert the changed CPI-U index to reflect the standard reference base period and structure of the CPI-U index that was in effect at the time of the execution of this Agreement ("Management Fee Adjustment Factor").  Every year thereafter the Annual Management Fee amount from the prior year shall be increased using the Management Fee Adjustment Factor.    Verification of the calculation for the increase in the Annual Management Fee must be submitted to the Commissioner by June 30th of each year.

C.   **Profit Share:**  The Manager shall pay the County annually as follows:

years 1 – 10    eight percent (8%),
years 11 – 20   ten percent (10%)
years 21 – 30   twelve percent (12%)

of net income generated from Playland Park ("Profit Share") provided, however, that the Manager shall not pay any Profit Share to the County until the Manager has recouped its Initial Payments and Manager's Investment, as defined in sub-section D below.  The net income shall be calculated in accordance with Generally Accepted Accounting Principles ("GAAP") excluding depreciation and amortization on the Twenty-Seven Million Seven Hundred and Fifty Thousand Dollars ($27,750,000.00) of the Manager's Investment, or on any increase in dollar amount of Manager's Investment as set forth in sub-section "D' below.  However, the calculation of net income will include depreciation and amortization with respect to all additional investments, capital expenditures, and other non-operating expenditures in accordance with GAAP.  Attached hereto and made a part hereof as **Schedule "L"** is a list that includes, but is not limited to, revenues and expenditures that will be used in the calculation of net income.

The annual Profit Share payment shall be payable annually within thirty (30) days of the completion of the annual audited financial statements of the Manager, but in no event longer than one hundred and eighty (180) days of the end of the calendar year for which such Profit Share payment is attributable.   The Manager shall, at its sole cost and expense, provide the Commissioner and the Commissioner of Finance with audited financial statements prepared and submitted by a nationally recognized independent Certified Public Accountant ("CPA"), including but not limited all of the details necessary to make the above calculation in support of the Profit Share, within ninety (90) days of the end of each calendar year in order to calculate the Profit Share.   The County reserves the right at its own cost to have a CPA conduct an independent audit of the calculation of the Profit Share.   In the event the County's auditor disputes the Manager's calculation, the Parties shall mutually select a nationally recognized

accounting firm ("Third Party Auditor") to review the calculation and supporting details. The Parties shall equally share in the cost of this review. The Parties agree to accept the conclusions of this Third Party Auditor.

D.    **Manager's Investment:**   The Manager shall undertake each item outlined in **Schedule "C-1"** at its sole cost and expense and shall make an investment of Twenty-Seven Million Seven Hundred and Fifty Thousand Dollars ($27,750,000.00) ("Manager's Investment"). The Manager shall provide monthly reports to the County which delineate all funds spent by the Manager which Manager claims as part of the Manager's Investment. Such monthly reports shall be provided to the Commissioner on or before the last day of the month following the month to which such monthly report relates, except that the first and second of such reports shall be delivered by the Manager on or before July 31, 2016. It is anticipated that the investment contained in **Schedule "C-1"** will be made within the first three (3) years following the Management Commencement Date, but the **Schedule "C-1"** improvements must be completed not later than five (5) years from the Management Commencement Date provided the County has substantially satisfied its prior obligations under this Agreement. In the event that the **Schedule "C-1"** improvements total less than Twenty-Seven Million Seven Hundred and Fifty Thousand Dollars ($27,750,000.00), the Manager shall pay the County the difference in addition to any other fees payable to the County set forth herein. Any such difference shall be payable within thirty (30) days of completion of the **Schedule "C-1"** items or five (5) years whichever is earlier. The Manager shall have flexibility to make reasonable adjustments to each item outlined in **Schedule "C-1"** in order to effectuate the improvements contemplated therein and also to provide flexibility to implement this Agreement.

In addition, the Manager shall have the right to increase the Manager's Investment up to an additional Five Million ($5,000,000.00) Dollars upon thirty (30) days prior written notice to the Commissioner. Any increase to the Manager's Investment beyond a total of Thirty Two Million Seven Hundred and Fifty Thousand ($32,750,000.00) Dollars, must be with the mutual consent of the Commissioner and the Manager.

E.    **County Debt:** The Parties recognize that the County has significant debt with respect to Playland Park that the County is obligated to repay. The Manager shall not have any obligation of any kind with respect to the County's existing debt relating to Playland Park or any other County debt.

F.    **Late Payments:** If any payment due from the Manager is not made within sixty (60) days after the date due and payable under this Agreement, such unpaid amount shall bear interest at the Default Rate as defined in Section 1(C) above.

G.    **Real Property Taxes:** It is the County's position that the Playland Park and operations by the Manager at Playland are not subject to property taxes. If, however, all or part of Playland, excluding the Tiki Bar and the Ice Casino, is subject to real property taxes, the Manager shall pay the first Fifty Thousand ($50,000.00) Dollars of such taxes annually. The County shall be responsible to pay real property taxes in excess of Fifty Thousand ($50,000.00) Dollars per annum. However, should real property taxes be assessed in excess of One Hundred Thousand ($100,000.00) Dollars per annum, the County shall have the right to terminate this Agreement immediately and Section 23B shall apply.

H.   **Unexpected Capital Expenditures**.   Unexpected and unplanned capital expenditures including, but not limited to, damage to property, buildings or equipment due to Force Majeure as defined in Section 39 shall be paid for by the County <u>only</u> to the extent that the County obtains insurance proceeds and/or disaster recovery funding or similar sources of funds payable to the County.  The County shall provide funding for such expenditures consistent with Section 13.  However, nothing contained herein shall limit the Manager's rights consistent with Section 23A and 23B below.


**SECTION 4:**        **Operating Plan**

The Manager shall, not less than sixty (60) days prior to the Management Commencement Date and by March 1st of each year thereafter, prepare and submit to the Commissioner for the Commissioner's review and approval, a written annual operating plan ("Manager's Operating Plan").  Notwithstanding any inconsistent provision of this Agreement, the Commissioner shall not deny a proposed operating plan unless he/she reasonably concludes that implementation of such plan will materially adversely impact the operation of Playland.  If the Commissioner does not provide the Manager within thirty (30) days a detailed line item response enumerating the particular components of the proposed operating plan which in his or her reasonable view materially adversely impact the operation of Playland, then said plan shall be deemed approved.  If the Commissioner does not approve the proposed operating plan in full, then the particular components of the Manager's Operating Plan not in dispute will go in to effect and the components of the Manager's Operating Plan in dispute will revert to the prior year Manager's Operating Plan and shall continue in force and effect until the disputed components of the new plan are approved, provided however, in the event that a disputed component relates to a capital improvement or investment to be undertaken by the Manager, no such capital improvement or investment will be required to be made until such disputed component is resolved.  The foregoing proviso does not apply to disputed operating expenditures.  In such event, it is understood that the Manager may adjust the dollar amounts contained in the disputed components of the prior year's plan by up to the greater of five (5%) percent or the prior year CPI up or down until a new plan takes effect.

The Manager's Operating Plan shall include, but not be limited to: schedule of salaries and payments to members of Standard Amusements LLC, including management fees charged by Standard Amusements LLC; a maintenance and repair schedule; a schedule of proposed changes to Playland's fee structure; a schedule of all new agreements to be entered into; recommendations, if any, for revisions to any of the Plans, Rules and Regulations required under Section 5 below; schedules, if any, for new non-capital and capital improvements of Playland facilities and acquisition of equipment; schedule of proposed changes to staffing levels; proposed changes to the advertising and promotional programs; daily operating schedule including changes to the length of season, hours of operation, and any other relevant factors which may affect Playland's operations and management.

**SECTION 5:**          **Plans, Rules and Regulations**

The Manager shall prepare, as part of Manager's Operating Plan, the below described plans, rules and regulations for Playland Park, and any amendments thereto, as follows:

(i)     Prepare in consultation with the Commissioner a set of written Rules and Regulations governing public use of, and behavior in Playland Park, including, but not limited to: visitor conduct, public hours and rules to ensure the well-being and safety of the public, the enjoyment of Playland Park by the public for its intended purposes, and the safe and efficient conduct of activities in Playland Park. In addition, the Manager may from time to time propose modifications of the Rules and Regulations. Such approval shall not be unreasonably withheld. All Rules and Regulations shall be promulgated in accordance with applicable law, and thereafter enforced by the Manager.

(ii)    Prepare in consultation with the Commissioner and the Commissioner-Sheriff of the County Department of Public Safety, and the Commissioner of the Department of Emergency Services, a written Security and Emergency Contingency Plan, in conformity with applicable federal, state and local laws, rules and regulations. Such Security and Emergency Contingency Plan shall be designed to protect the safety and security of the general public, the Parties' personnel and property on a daily basis.

**SECTION 6:**          **Improvements to be undertaken by the Manager**.

A.     **Material Improvements**. "Material Improvement" shall mean any renovations, construction or demolition to the land, buildings and infrastructure at Playland Park that materially changes the size, location, and character of the existing land, buildings and infrastructure at Playland Park. Should it be determined by the County that a Material Improvement has been proposed by the Manager all requirements of law shall apply. Notwithstanding the foregoing, the addition, removal or modification of rides, except historic rides, games concessions, restaurants, or retail shops, shall not be subject to this paragraph.

B.     **County Review of Plans and Specifications.** Notwithstanding anything herein to the contrary, during the Term of this Agreement, for improvements to be undertaken by the Manager at Manager's cost and expense, the Manager shall provide the Commissioner and the Commissioner of the Department of Public Works and Transportation or his designee ("DPW&T Commissioner"), for their review and comment, with record copies of plans and specifications at various stages, but at least at the fifty (50%) percent and ninety (90%) percent stages, of design and construction for any improvements to Playland Park that would require the preparation of plans and specifications ("Plans and Specifications"). The Commissioner and the DPW&T Commissioner, shall furnish a written statement as to whether or not the Plans and Specifications materially adversely affect the County's obligation to maintain the Park for the public's use and enjoyment and are in compliance with all applicable codes, rules and regulations in effect at the time of construction within fifteen (15) business days, not including County holidays, from the date of receipt of such Plans and Specifications from the Manager. The Manager, if necessary, shall prepare and submit revised Plans and Specifications for the Commissioner and the DPW&T

Commissioner's review and comment. Notwithstanding the above, if the Commissioner and the DPW&T Commissioner does not respond within said fifteen (15) business day period, approval shall be deemed granted.

C.  **Approvals for Improvements**. The Manager will procure all required permits and approvals for any improvement by any and all governmental authorities having jurisdiction thereof for any improvement to be undertaken by the Manager at Manager's cost and expense, and, if necessary, the County shall cooperate with Manager to procure same.

At the request of the Manager, the Commissioner will use commercially reasonable efforts to cooperate with the Manager to obtain all non-County approvals, and the Manager is hereby authorized to submit applications in the name and stead of the Commissioner to obtain such approvals, but without expense to the County in procuring any such permits and approvals.

To the extent that any County approvals can only legally be issued during implementation or upon completion of the improvements, any approval of the Commissioner or any other County commissioner or department under the administrative jurisdiction of the County Executive shall be subject to the provisions of Section 2(Y) above.

D.  **Closures.** During the implementation of any improvement to be undertaken by the Manager at Manager's cost and expense, portions of Playland Park may be closed and the Manager shall not be required to provide any services to the public with respect to the closed area during such periods of demolition, construction, renovation, repairs and equipping until such portion of Playland Park is reopened to the public.

E.  **Performance Bonds.** No capital improvements, material or otherwise, or changes, alterations or non-recurring maintenance to existing or future improvements, which are undertaken by the Manager at Manager's cost and expense and which are estimated to cost more than Two Hundred and Fifty Thousand ($250,000.00) Dollars, shall be commenced unless at the time thereof the Manager shall have obtained a performance and payment bond, for or from each prime contractor performing construction work, guaranteeing the full and faithful performance and completion of construction and the payment of the entire cost thereof, and having as a surety thereon a surety company of recognized responsibility and duly authorized to do business in the State of New York in a penal sum equal to one hundred (100%) percent of the estimated cost of construction.

F.  **Reasonable Diligence.** The Manager shall implement any improvements to be undertaken by the Manager at Manager's cost and expense with commercially reasonable diligence.

G.  **Standards and Criteria.** In the event Manager determines to renovate or build one or more improvements at Manager's cost and expense, each such improvement shall, except as otherwise agreed to in writing, meet the following:

(i)  Be reasonably consistent with industry standard design, character and appearance.

(ii)    Be reasonably consistent with Playland Park's unique status, including but not limited to, Playland's listing on the National Register of Historic Places as a National Historic Landmark, and Playland's art deco style.

(iii)   Be constructed in accordance with all applicable laws, ordinances, regulations or orders of any federal, state, municipal or other public authority affecting the same, including but not limited to, the New York State Uniform Fire Prevention and Building Code Act.   In addition, all improvements shall be constructed in accordance with all requirements of the New York Board of Fire Underwriters or other similar body having jurisdiction thereof and the National Electrical Code.

(iv)    Be free of liens and encumbrances for labor and materials supplied in connection with such work.

(v)     Be of a character that, when completed and evaluated in the totality, will not decrease the overall value of Playland Park.

H.    **Final Plans and As Built Drawings**.   Copies of all final plans, "as built" drawings (which shall be deemed to include final plans with field notations thereon) and equipment and building system operating and maintenance manuals, for any improvement to be undertaken by the Manager at Manager's cost and expense, shall be delivered by the Manager to the Commissioner and the DPW&T Commissioner to complete the County's files.

I.    **Improvement Insurance**.   No improvements to be undertaken by the Manager at Manager's cost and expense shall be commenced unless the Manager or an approved subcontractor shall first have procured, at its own cost and expense, and delivered to the Commissioner proof of insurance coverages as required by **Schedule "E"** which is attached hereto and made a part hereof, including copies of policies if requested by the County Director of Risk Management.   In particular, the insurance certificate shall identify the specific improvement and the policy shall be endorsed to cover such improvement and the endorsement provided to the County Director of Risk Management.

In addition, the Manager shall ensure that its contracts with any and all third parties that are engaged to perform any work, or otherwise enter upon or occupy any portion of Playland Park, shall include a written requirement that said third parties shall procure and maintain insurance naming the County of Westchester as an additional insured as its interest may appear, and that such third parties shall, at its own cost and expense, procure and deliver to the County proof of the above insurance coverages, including copies of policies if requested by the County Director of Risk Management.

Each party hereto shall cause each insurance policy obtained by it to provide, to the extent available, that the insurer waives all right of recovery by way of subrogation against the other party in connection with any damage and/or liability covered by said insurance.

J.    **Certificates**.   Manager shall obtain and deliver to the Commissioner and DPW&T Commissioner copies of all proper certificates from the County Department of Health, the Board of Fire Underwriters, or such other certificates as are customarily obtained from any department or bureau having jurisdiction.   Unless a certificate of occupancy shall hereafter be held to be

legally required, Manager shall deliver to the County a certificate of completion, signed by Manager's engineer or architect.

     K.    **Inspection**. During implementation of any improvement to be undertaken by the Manager at Manager's cost and expense, the Commissioner or the DPW&T Commissioner, or his/her designees, may, from time to time, and at reasonable times upon reasonable prior notice, inspect such improvement provided that the conducting of such inspection shall not interfere with Manager's construction activities or operation as an amusement park.

     In the event that, during the implementation of any improvement undertaken by the Manager and prior to the completion of same, the Commissioner and/or DPW&T Commissioner, or his/her designees, shall reasonably determine that the improvement is not being constructed substantially in accordance with the Plans and Specifications and/or the applicable terms and conditions of this Agreement, then the Commissioner and/or the DPW&T Commissioner shall give prompt notice in writing to the Manager, specifying in detail the particular deficiency or omission in which the Commissioner and/or the DPW&T Commissioner claims construction does not accord with the above requirements. Manager shall respond within thirty (30) days notifying the Commissioner and/or the DPW&T Commissioner that Manager will remedy the deficiency and provide a Timetable within which to do so. It shall be the responsibility of the DPW&T Commissioner to schedule inspections at times he deems reasonably necessary and the Manager has no obligation to stop or delay construction because the DPW&T Commissioner is unable to inspect at the appropriate time during the construction cycle.

     L.    **Document Ownership Upon Default**. In the event this Agreement shall be terminated by reason of the default of the Manager as provided in this Agreement prior to the completion of any improvement to be undertaken by the Manager at Manager's cost and expense, any and all Plans and Specifications, reports, estimates and models which shall have been prepared or made in connection with any improvement and which shall be in the possession of, and owned by, the Manager and any approved subcontractors, shall become the property of the County.

     M.    **Exemption from Retail Sales Tax and Compensating Use Tax.** The Manager's attention is directed to Section 1115 of the Tax Law of New York State, Chapters 513 and 514 of the Laws of 1974. In connection with capital improvement contracts entered into on or after September 1, 1974, all tangible personal property which will become an integral component of a structure, building or real property of New York State, or any of its political sub-divisions, including the County of Westchester, is exempt from State and local retail sales tax and compensating use tax. In order to utilize such exemption, the Manager shall be obliged to file the required Contractor Exempt Purchase Certificates, which may be obtained from the New York State Department of Taxation and Finance (1-800-462-8100).

     N.    **SEQRA**.    The Manager further understands and agrees to provide the County with all information necessary for the County to comply with the New York State Environmental Quality Review Act and its implementing regulations ("SEQRA") for any work done under this Section 6 which requires SEQRA compliance where such work is undertaken by the Manager at Manager's cost and expense.

**SECTION 6-a.  Improvements undertaken by County**

(i)      **County Capital Process.**      If an improvement is one that is classified as being the County's responsibility under Section 2-a and 12 of this Agreement, and one that requires either an amendment to the County's Capital Budget and authorization for bond funds, or both, then the County Executive will cause legislation relating to the same to be prepared for submission to the Board of Legislators promptly after any request thereof by the Manager and the County Executive will promptly submit such legislation to the Board of Legislators for its consideration.   Under these circumstances, the Manager shall prepare and submit to the Commissioner a list, along with detailed information, of each and every proposed Material Improvement to be made in Playland Park.   Such list, along with the supporting detailed information shall include, but not be limited to:

- an illustrated site plan that shows existing and proposed changes;
- preliminary plans and drawings prepared by a licensed architect;
- a project by project scope of work and cost estimates which includes prevailing wage and also indicates unit prices for major construction items;
- a proposed schedule for implementation of each Material Improvement ("Timetable(s)").  A proposed Timetable shall include, but not be limited to, a construction schedule for each project; and
- a statement of all major actions that are required to implement each such project and the affect such actions will have on Playland Park, including but not limited to, construction and demolition.

Upon submission of the above, the County Executive will cause legislation to be promptly submitted to the Board of Legislators for their review and approval.

(ii)      **Pre-Qualification and Selection.**  The County will be responsible to comply with all applicable local laws and rules for the prequalification and selection of architects, engineers and land surveyors for any improvement that the County is responsible for under this Agreement. (See Laws of Westchester County-§161.31 and §277.81 - §277.121; see also Act 5-1976, Act 22-1992 and Act 144-1996.)  The Manager shall assist the County by providing names of firms with specific expertise in amusement park work for prequalification.

(iii)      **Public Bidding.**  The County will be responsible to comply with all applicable laws and rules regarding public bidding for any improvement that the County is responsible for under this Agreement.   The Manager shall cooperate with the County in connection with the County's obligation to publicly bid an improvement.

(iv)      **Manager to act as agent to oversee capital projects.**  Upon contract execution with the consultant selected in accordance with the pre-qualification and selection laws of the County and contractors that are awarded contracts that were publicly bid, the County shall notify the Manager and the Manager at its option may act as the County's agent and carry out all of the County's duties and responsibilities in accordance with the terms of those agreements.

**SECTION 7:**          **Utilities.**

As the owner of Playland Park, the County shall remain responsible to continue to provide or cause to be provided all utility connections, including water and electricity, cable/fiber optics, sanitary sewer facilities and the like serving Playland Park on the Management Commencement Date (including those intended to be provided and necessary for the operation of Playland Park even though they may be temporarily out of service or seasonally discontinued on the Management Commencement Date). The County shall provide any and all utilities that are currently provided in Playland including but not limited to, electric, water, fuel oil, propane and gasoline ("Utility(ies)"). Any other utilities that are not included within this definition are the Manager's responsibility to obtain and pay for separately.

The Manager shall be responsible for the payment of all charges for Utilities, within thirty (30) days of receipt of a bill from the County. The County shall pass along any discounts that is receives by virtue of the fact that it is a municipality. The Manager shall not be responsible to pay for Utilities used at the Ice Casino, Tiki Bar and/or Westchester Children's Museum, as long as same are operated by a third-party. If Manager takes over operation of any of these facilities, then Manager shall be responsible to pay for Utilities.

The Manager acknowledges that the County is committed to pursuing alternative energy generation, including, but not limited to, solar and geothermal ("alternative energy generation"), on County-owned facilities, including at Playland Park and in particular utilizing the parking lot and other surface areas, where practicable. In furtherance of this commitment, the Parties shall work together to determine the feasibility and efficacy of pursuing such alternative energy generation for the purpose of reducing utility costs and maximizing energy efficiency, provided that the implementation and undertaking of such alternative energy generation does not increase the Manager's costs and expenses or adversely affect the operations of Playland Park and that any capital expenditures to be made by the Manager for the implementation and undertaking of such alternative energy generation shall be in the Manager's sole discretion. The foregoing, however, does not preclude the County from pursuing alternative energy generation at its own cost and expense.

The Manager shall not seek damages from the County and not hold the County liable for an interruption of any Utility service that is not due to the County's actions or omissions.

The County shall cooperate with the Manager should the Manager, at its sole cost and expense, desire to install sub-meters at Playland Park after the Management Commencement Date. If the Manager installs a sub-meter, it shall still have the option to purchase Utilities through the County and reimburse the County for all charges for Utilities on a monthly basis.

The County will be responsible for the costs of maintaining or improving the utility distribution systems at Playland Park at levels necessary to support attendance of up to one million visitors annually at Playland Amusement Park. Any and all costs necessary to maintain and improve the utility distribution systems at Playland Park above the levels necessary to support attendance of over one million visitors annually, shall be borne by the Manager.

Notwithstanding the above, to the extent the Manager or any approved subcontractors make any improvement which would necessitate: (i) a new connection to any existing utility distribution system(s) at Playland maintained by the County (e.g. electricity, telephone, sewer and water); or (ii) increase the demand for such utility distribution systems; or (iii) otherwise materially affect the capacity or efficiency of such utility distribution systems, the prior review and approval of the DPW&T Commissioner shall be required, not to be unreasonably withheld, conditioned or delayed.

Manager, at its sole cost and expense, for any improvement requiring review under this Section, shall cause building mechanical schematics and site plans and specifications showing the method and location of all utility connections, normal and peak load demands for such services and such other information reasonably required by the DPW&T Commissioner to determine the effect, if any, of such increase in service on the capability, reliability and efficiency of the existing utility distribution systems at Playland.

**SECTION 8:**       **Temporary Closing of Playland Park or Selected Areas**.

After the Management Commencement Date, the Commissioner shall notify the Manager of any closing by the County (County department or instrumentality acting on behalf, at the request of, or for the benefit of, the County) of the Park, or any portion thereof, due to an emergency or disaster declared by any federal, state or local government in accordance with applicable law. Such notice to the Manager shall be provided at the earliest possible time considering all of the facts and circumstances surrounding the emergency.

Manager shall not be obligated to pay the full Annual Management Fee for any period when Playland Park is closed per this Section 8, if Playland Park is closed for more than ten (10) business days during an operating season within a twelve (12) month period. In such circumstance, the Annual Management Fee will be prorated for the appropriate period of time that Playland Park is closed.

**SECTION 9:**       **Permits and Sponsorships**.

A.       Sponsorships. After the Management Commencement Date, the Manager shall manage the application and processing of corporate sponsorships relating to Playland Park ("Sponsorship Agreement(s)"), except for those contracts, licenses and lease delineated in Section 1 above (e.g. Ice Casino, pouring rights, Children's Museum) which the Manager has no rights to. Applications for Sponsorship Agreements shall be made to the Manager, who shall make the determination whether the requested Sponsorship Agreement is appropriate for a family park considering all of the available facts and circumstances.

The Manager agrees that it will not enter into any Sponsorship Agreement with any person or entity that engages in activities that are clearly defamatory or engages in activities that are offensive to the reasonable standards of the community.

B.       Permits.

(i)       Other than normal operational uses of Playland Park, the Manager shall give the Commissioner reasonable notice of any public programs, events, meetings or

28

other public functions of any kind to be held by the Manager, or an approved subcontractor, in Playland Park.  Unless the Commissioner, within seventy-two (72) hours of receipt of such notice, notifies the Manager that such activity may not be conducted, the Manager may conduct such activity, except for those routine performances approved by the Commissioner as part of the Annual Operating Plan (such approval will not be unreasonably withheld, conditioned or delayed).

(ii)     During the Term, except as specifically provided in sub-paragraph (i) above, the Commissioner shall grant or withhold permits in Playland Park for assemblies, meetings, exhibits and or other activities in accordance with the rules and regulations of the Department of Parks, Recreation and Conservation. Application for a permit for any such assembly, meeting, exhibit and or other activity shall be made to the Manager, which shall recommend to the Commissioner that the permit be granted or denied, except for those which are specifically approved by the Commissioner in the Annual Operating Plan  (such approval will not be unreasonably withheld, conditioned or delayed).

(iii)    Notice of each application for a permit under sub-section (ii) above, and of the Manager's recommendation as to such application, shall be sent to the Commissioner at least thirty (30) days before the commencement of any assembly, meeting, exhibit and or other activity for which permission is sought (or such shorter time as is practicable, if the Manager notifies the Commissioner that time is of the essence).  Unless the Commissioner shall give notice to the Manager, no later than fifteen (15) days prior to the commencement of the proposed permitted activity (or if it the Commissioner has received less than thirty (30) days' notice, as soon as practicable), that the Manager's recommendation is disapproved, with reasons therefore, the Manager's recommendation as to such application shall be deemed approved.

        C.    Advertising.  Except for those existing agreements that cannot be assigned to the Manager (e.g. County-wide bus and bus stop advertising agreement) or will not be assigned under this Agreement (e.g. automated teller machine agreement), the Manager shall have the right to sell signage and/or advertising for use inside Playland Park.  If the Commissioner finds any of the content to be clearly defamatory or offensive to the reasonable standards of the community then the Commissioner shall request a modification to the signage and/or advertising which modification will not be unreasonably withheld or delayed by the Manager.

        It is understood and agreed that nothing in this Agreement grants authority to the Manager for the naming rights of Playland Park, or any facility, building or area in Playland Park. Such naming rights rest solely with the County.

        The County retains the right to advertise in Playland Park for other County programs or events, provided that the quantity and location of such advertisements shall be mutually agreed upon by the Parties.

**SECTION 10:**        **Assignment and Subcontracting**.

The Manager shall not delegate any duties or assign any of its rights under this Agreement, or subcontract any part of the Work, without the prior express written consent of the County, which consent will not be unreasonably withheld, conditioned or delayed.   The County shall consider only the following criteria when determining whether to consent to a subcontract, assignment or delegation of duties proposed by the Manager: subcontractor's, assignee's or delegee's integrity; subcontractor's, assignee's or delegee's prior performance of a County contract(s), and subcontractor's, assignee's or delegee's compliance with Federal, State, and Local Laws and Regulations. Any purported delegation of duties, assignment of rights or subcontracting of Work under this Agreement without such prior express written consent is void.

All subcontracts, assignments or delegations that have received such prior written consent shall provide that subcontractors, assignees, or delegees are subject to all terms and conditions set forth in this Agreement. It is recognized and understood by the Manager that for the purposes of this Agreement, all Work performed by County-approved subcontractors, assignees or delegees shall be deemed Work performed by the Manager and the Manager shall use commercially reasonable efforts to ensure that such subcontracted, assigned or delegated work is subject to the material terms and conditions of this Agreement. All subcontracts, assignments or delegations for the Work shall expressly reference the subcontractor's, assignee's or delegee's duty to comply with the material terms and conditions of this Agreement and shall attach a copy of the County's contract with the Manager.    The Manager shall obtain a written acknowledgement from the owner and/or chief executive of subcontractors, assignees or delegees or his/her/their duly authorized representative that the subcontractors, assignees or delegees has/have received a copy of the County's contract, read it and is familiar with the material terms and conditions thereof. The Manager shall include provisions in its subcontracts, assignments and/or delegations designed to ensure that the Manager and/or its auditor has the right to examine all relevant books, records, documents or electronic data of the subcontractors, assignees or delegees necessary to review the subcontractor's, assignee's or delegee's compliance with the material terms and conditions of this Agreement. For each and every year for which this Agreement continues, the Manager shall submit to the Commissioner a letter signed by the owner and/or chief executive officer of the Manager or his/her duly authorized representative certifying that each and every approved subcontractor, assignee or delegee is in compliance with the material terms and conditions of the Agreement.

**SECTION 11:**        **Employees**.

The Manager shall, as of the Management Commencement Date, have the sole and exclusive right and power to select, appoint, employ, direct, supervise, control, remove, discipline and discharge all persons employed by the Manager in Playland Park. The Manager's rights in this respect shall include, but not be limited to, the right to establish all terms and conditions of employment, to fix compensation, and to make promotions on the basis of fitness and ability. The Manager shall ultimately be responsible to the County for the employees of any approved subcontractors who carry out its duties under this Agreement, as the County shall have no contractual privity with such subcontractors.

All employees who carry out the Manager's duties under this Agreement shall be the employees of Manager or of approved subcontractors and not of the County. All matters pertaining to the employment of such employees shall be the sole responsibility of Manager or of its approved subcontractors and the County shall bear absolutely no responsibility or liability therefore.

The County shall make available certain Playland Park employees with specialized skills to train Manager's employees during the first year after the Management Commencement Date, as agreed to by the Parties in a separate writing.

All County employees who work in any capacity at Playland Park or who have responsibilities of any kind with respect to Playland Park prior to the Management Commencement Date and who are not hired by the Manager or an approved subcontractor as of the Management Commencement Date shall remain the sole responsibility of the County.

Manager, and its approved subcontractors, shall establish, administer, and maintain the payroll procedure and systems for Manager's employees at the Park and shall be responsible for overseeing the benefits to, and handling the appropriate payroll deductions for, individual employees. Manager, and its approved subcontractors, shall fully comply with all applicable laws and regulations concerning workers' compensation, social security, unemployment, tax withholding and reporting, hours of labor, wages, working conditions and all other laws affecting or respecting the employment of such employees or independent contractors. All employees of Manager and all approved subcontractors shall be a citizen of the United States or an alien who has been lawfully admitted to the United States for permanent residence as evidenced by an alien registration receipt card. The Manager shall use commercially reasonable efforts to hire employees who are residents of Westchester County. The Manager, and its approved subcontractors, shall supervise and train its staff to perform their duties and to conduct themselves in an orderly and professional manner at all times. Each employee must thoroughly understand the need to exercise and display a courteous and polite demeanor when dealing with the public. The Manager, and its approved subcontractors, shall be required to remove from Playland Park any employee whose conduct, demeanor or appearance is objectionable to the Commissioner (which objection is based on Department of Parks, Recreation and Conservation standards and is in compliance with all laws) after consultation with the Manager. The Manager, and its approved subcontractors, shall have no authority to enter into any employment contract which purports to be on behalf of the County, or which otherwise obligates the County in any respect. The Manager, and its approved subcontractors, shall comply with federal and state labor and/or employment laws.

The Manager shall have the option to utilize the full-time County employees that are assigned to work at Playland from and after the Management Commencement Date. The Manager must notify the County of its intention to use these full-time employees by August 31 of each year of the Term. Should the Manager desire to use the full-time employees such use shall be for one full year. If the Manager desires to continue to use these employees the Manager shall provide notice to the County in accordance with this paragraph. If the Manager determines not to use these employees the County does not have to guarantee their availability from and after that point in time. If the Manager notifies the County that it will be utilizing these employees, the Manager shall reimburse the County as follows:

The Manager shall reimburse the County one hundred (100%) percent of salary and overtime expenses for such employees plus thirty (30%) percent of salary for fringe benefits per employee.  The Manager shall provide such reimbursement on a quarterly calendar basis within thirty (30) days of receipt by the Manager of a County invoice detailing the particular employee, hours worked, hourly rate and benefits.  The Manager shall have the option to utilize the full-time County employees that are assigned to work at Playland at this specified rate for a maximum of two years from the Management Commencement Date.  After the two years, the above rate will change and if the Manager desires to continue to utilize the full-time County employees that are assigned to work at Playland, the Manager shall reimburse the County one hundred (100%) percent of salary and overtime expenses for such employees plus one hundred (100%) percent of the County's actual cost for fringe benefits per employee.

Notwithstanding any provision of this Agreement to the contrary, the County shall be responsible for any employment claims or disputes by any employee employed by the County with respect to such employee's employment by the County prior to the Manager's employment of such employee by the Manager.

The County shall not be obligated to replace any full-time County employee that is assigned to work at Playland should such employee leave the County's employment for any reason whatsoever.

The Manager acknowledges the County is a large summer youth employer and the Manager agrees that it will continue to support this arrangement.

Attached hereto and made a part hereof as Schedule "M" is the "Intra-Governmental Memorandum of Understanding by and among the County Executive and the County Board of Legislators of Westchester County, New York Dated the 10th day of August, 2015" ("Intra-Governmental MOU") regarding full-time employees currently working at Playland.  The Manager acknowledges that while not a party to this Intra-Governmental MOU, the Manager understands the importance of the arrangement.


**SECTION 12:**          **Equipment and Amusement Park Rides**.

A.       **Equipment.**

The Manager shall, as of the Management Commencement Date, assume the use of all equipment which is the property of the County and has not been removed by the County in accordance with Section 1(E)(iv) of this Agreement and a list of such equipment shall be created and attached hereto as **Schedule "B"** prior to the Management Commencement Date.  The equipment shall be in good working order as of the Management Commencement Date.

The Manager will procure additional equipment that it deems necessary for the proper execution of its responsibilities as set forth herein and shall supply equipment reasonably deemed necessary for the proper operation of Playland Park after the Management Commencement Date, and make full payment for the same.

"Fixed Equipment" shall be defined as items or fixtures that are permanently or structurally attached to the County's premises. Fixed Equipment shall <u>not</u> include items or fixtures that can be removed without material damage or destruction to the adjacent area within or upon the County's premises ("Removable Personal Property"). If requested, the County shall reasonably cooperate with the Manager in connection with the removal of any Removable Personal Property and upon removal of any Removable Personal Property, the Manager, at its sole cost and expense, shall make all necessary repairs to restore the area damaged by such removal. Removable Personal Property will be limited to property acquired by the Manager and will not include any property that belongs to the County. Any Removable Personal Property procured by the Manager in order to fulfill its obligations herein will remain the property of the Manager, except that if the Manager removes such personal property upon the early Termination of this Agreement, it cannot seek recovery of the unamortized cost of such equipment in the event of such early Termination pursuant to Section 23B below. Once any Removable Personal Property is fully depreciated pursuant to the Internal Revenue Code schedules, the Manager shall not be allowed to keep the Removable Personal Property. At the point in time that the subject property is fully depreciated pursuant to the Internal Revenue Code schedules ownership of that property shall transfer to the County.

Any Equipment will be replaced as follows:

(i)    The Manager shall be responsible if the Equipment is required to perform the Work as defined herein (e.g.: lawn mower); and

(ii)   The County shall be responsible if the Equipment is structurally necessary for the Manager to perform the Work as defined herein (e.g. HVAC system equipment).

Title to Fixed Equipment purchased by the Manager or an approved subcontractor for use at Playland Park shall vest in the County at such time as the Fixed Equipment is affixed to the County's premises at Playland Park. To the extent permitted by law, the Manager, and/or its approved subcontractors, shall have the right, for tax purposes under the Internal Revenue Code, to immediately expense such Fixed Equipment.

B.    **Amusement Park Rides.**

The Manager shall, as of the Management Commencement Date, assume the use of all County-owned amusement park rides. There are seven (7) historic rides owned by the County and thirty five (35) non-historic rides owned by the County. Such licensed non-historic rides shall be treated in accordance with Section 1(E)(ii) of this Agreement. With respect to County-owned non-historic rides, the Manager has the discretion to replace any one or more of such rides in accordance with the terms set forth herein. For a list of all County-owned amusement park rides see **Schedule "F"** which is attached hereto and made a part hereof.

The Manager shall maintain, repair and operate the historic rides listed in **Schedule "F"** in accordance with the following: the National Historic Preservation Act and its applicable regulations, standards and guidelines; current industry standards; operating and maintenance manuals applicable to such historic rides; and other applicable laws, rules, regulations and

requirements, including but not limited to, operating permit conditions promulgated by the New York State Department of Labor.

The Manager shall maintain, repair and operate the non-historic rides, including those listed in **Schedule "F"** as well as any such rides that Manager brings into the Park whether owned, leased or licensed by the Manager, in accordance with the following:  the manufacturer's standards, as set forth in applicable manuals, guidelines and bulletins; any other operating and maintenance manuals applicable to such non-historic rides; current industry standards; and applicable laws, rules and regulations, including but not limited to, operating permit conditions promulgated by the New York State Department of Labor.

In addition to the rides that Manager has committed to procure in accordance with **Schedule "C-1",** the Manager shall procure such additional rides that it deems necessary for the proper execution of its responsibilities as set forth herein after the Management Commencement Date, and make full payment for the same.

"Fixed Amusement Park Rides" shall be defined as amusement park rides that are permanently or structurally attached to the County's premises.  Fixed Amusement Park Rides shall <u>not</u> include amusement park rides that can be removed without material damage or destruction to the adjacent area within or upon the County's premises ("Removable Amusement Park Rides").  If requested, the County shall reasonably cooperate with the Manager in connection with the removal of any Removable Amusement Park Rides, and upon removal of any Removable Amusement Park Rides, the Manager, at its sole cost and expense, shall make all necessary repairs to restore the area damaged by such removal.  Removable Amusement Park Rides will be limited to property managed by the Manager and will not include any property that belongs to the County.  Any Removable Amusement Park Rides procured by the Manager in order to fulfill its obligations herein will remain the property of the Manager, except that if the Manager removes such Removable Amusement Park Rides upon the early Termination of this Agreement, it cannot seek recovery of the unamortized cost of such Removable Amusement Park Rides in the event of such early Termination pursuant to Section 23B below.  Once any Removable Amusement Park Rides are fully depreciated pursuant to the Internal Revenue Code schedules, the Manager shall not be allowed to keep the Removable Amusement Park Rides.  At the point in time that the subject ride is fully depreciated pursuant to the Internal Revenue Code schedules ownership of that ride shall transfer to the County.

Title to Fixed Amusement Park Rides purchased by the Manager or an approved subcontractor for use at Playland Park shall vest in the County at such time as the Fixed Amusement Park Rides are affixed to the County's property at Playland Park.  To the extent permitted by law, the Manager, and/or its approved subcontractors, shall have the right, for tax purposes under the Internal Revenue Code, to immediately expense such Fixed Amusement Park Rides.

C.     **Prohibition against sale or disposal of County property.**

It is recognized and understood by the Parties that the Manager does not have the right to sell or dispose of any County property which the Manager has the right to use to carry out the

terms of this Agreement. Such property may only be sold or disposed of by the County in accordance with Section 836.31 of the Laws of Westchester County.

**SECTION 13:**          **Subject to Appropriations**.

The Parties recognize and acknowledge that the obligations of the County to pay amounts or incur any expense or financial liability under this Agreement are subject to annual appropriations by the Board of Legislators. Therefore, the payment obligations of the County under this Agreement shall be deemed executory only to the extent of the monies appropriated and available for payment. In the event that the County is obligated to pay amounts to the Manager under this Agreement including amounts due under Section 23B hereof, the County Executive hereby covenants and agrees to:

(i)     include in the next annual County budget (operating or capital) that it submits to the Board of Legislators after any such amounts due to the Manager under this Agreement shall become due and owing by the County, a request for appropriation (including executive authorization for payment) of funds sufficient to pay all such amounts due and owing from the County under this Agreement and if such appropriation is not made by the Board of Legislators, include a request for appropriation for such amounts due and owing to the Manager in each annual County budget thereafter until such amounts have been paid by the County;

(ii)    use its best efforts to cause the Board of Legislators to appropriate amounts that will be sufficient to enable the County to pay all such amounts due and owing under this Agreement, including exhausting all available reviews and appeals if such amounts are not appropriated; and

(iii)   if appropriated and available for payment, pay to the Manager all amounts due and owing to the Manager under this Agreement.

The Parties understand and intend that the obligation of the County hereunder shall constitute a current expense of the County and shall not in any way be construed to be a debt of the County in contravention of any applicable constitutional or statutory limitations or requirements concerning the creation of indebtedness by the County, nor shall anything contained in this Agreement constitute a pledge of the general tax revenues, funds or moneys of the County. The County shall pay amounts due under this Agreement exclusively from legally available funds appropriated for this purpose. To the extent any funds due from the County under this Agreement are insufficient in any year, the Manager shall have no obligation to fund such deficiency except as may be specifically set forth herein.

Notwithstanding anything herein to the contrary, the failure of the Board of Legislators to appropriate amounts due under this Agreement in any one fiscal year of the County will not result in a termination or expiration of this Agreement and in the event an appropriation is not made by the Board of Legislators, the obligations of the County Executive set forth in (i), (ii) and (iii) immediately above shall continue in each subsequent fiscal year until amounts due the

Manager under this Agreement are appropriated by the Board of Legislators and the Manager is paid in full.

**SECTION 14:      Inspection**.

The Commissioner, or his/her designee, and the County Director of Risk Management, or his/her designee shall be entitled to enter any space assigned to Manager hereunder for the purpose of inspecting, observing and monitoring any aspect of the Manager's operations. Manager shall also permit inspection, observation and monitoring of same by any federal, state, county or municipal officer having jurisdiction, at reasonable times upon reasonable prior notice to Manager. The Manager, at its sole cost and expense, shall promptly, and within a reasonable timeframe, remedy any and all violations issued as a result of such inspection.

**SECTION 15:      Eminent Domain**.

In the event that the space assigned to Manager hereunder, or such a substantial part thereof so as to render impossible the operation of this Agreement, is taken by eminent domain, this Agreement shall terminate on the date upon which title vests in the condemnor and neither party shall have any liability to the other on account of such. If the Agreement is terminated pursuant to this Section 15, the County in accordance with Section 13, will reimburse Manager in accordance with the provisions of Section 23B.

**SECTION 16:      Condition of Playland Park**.

The Manager acknowledges that the County has not made any representation as to the condition of Playland Park or any structures, improvements, equipment (except that equipment transferred from the County to the Manager under Section 12 above shall be in good working order), rides, vehicles, machinery and tools situated at Playland Park and accepts same in "as is" condition. The Manager further acknowledges, that as of the Management Commencement Date, that it has inspected Playland Park and the structures, improvements, equipment, rides, vehicles, machinery and tools and that it relies solely upon such inspection. Nothing contained in this section will affect either Parties' responsibility for maintenance and repairs outlined in this Agreement.

**SECTION 17:      Bankruptcy**.

If at any time during the Term of this Agreement, any petition in bankruptcy shall be filed by or against Manager and if filed against the Manager, remains uncontested by the Manager or if Manager shall be adjudicated as bankrupt; or if a Receiver shall be appointed to take possession of Manager's property; or if Manager shall make any assignment for the benefit of creditors, this Agreement shall, at the option of the BAC immediately cease, terminate or expire. Nothing hereunder shall relieve Manager from any liability incurred under this Agreement except as same may be discharged in bankruptcy.

**SECTION 18:      Audit Provisions**.

A.      Upon request by the County, no more than once a year and not to extend beyond the prior year, Manager shall complete annual financial reviews at its own cost and expense. The

agreements with the approved subcontractors of Playland Park shall include the right to conduct annual financial reviews of such books and records of the approved subcontractors' operations at Playland Park in accordance with generally accepted auditing standards, consistently applied. Without limiting the County's rights below, copies of such reviews shall be promptly submitted to the County Commissioner of Finance and Budget Director when issued.  In addition, the County Commissioner of Finance, or his/her designee, may, at his/her option and at the County's sole cost and expense, annually conduct its own financial review of such books and records of the Manager for the prior calendar year.  The County Commissioner of Finance reserves the right to conduct such annual financial review up to one year after the expiration or termination of this Agreement.

B.     The Commissioner also reserves the right to annually audit the Manager's, and its approved subcontractors', performance under this Agreement at the County's sole cost and expense.  Such audit may include requests for documentation or other information which the Commissioner may deem necessary and appropriate to verify the information provided by the Manager under the terms of this Agreement.  The County may also make site visits to the location(s) where the services to be provided under this Agreement are performed, upon reasonable prior written notice to Manager, in order to review Manager's or approved subcontractor's records and to observe the performance of services, and/or to conduct interviews of staff and patrons, where appropriate and not otherwise prohibited by law.  In exercising this right to audit performance hereunder, the Commissioner may not intrude upon or disrupt in any manner the business and activities being conducted by the Manager or an approved subcontractor and any dissatisfaction on the part of the Commissioner observed on site at Playland Park shall be conveyed to the Manager or an approved subcontractor in private and out of earshot of any member of the public or any employee working in the Park.   If the Commissioner's dissatisfaction warrants it, any verbal discussion shall be followed up by a written report delivered to the Manager or an approved subcontractor.

**SECTION 19:**  `      `**Property Insurance, Damage or Destruction**.

To safeguard the interests and property of the County, the County in its own name as the insured, will procure, maintain and pay for, throughout the Term of this Agreement, all risk insurance policies covering County-owned structures, County-owned boiler and machinery, County-owned contents, Fixed Equipment, and improvements at Playland Park which the County owns or obtains title to pursuant to this Agreement.  Such policies shall cover one hundred (100%) percent of the insurable replacement value thereof, reserving the right to increase such coverage as and when the replacement values increase.  Insurance proceeds, if any, shall be paid to the County.

After the Management Commencement Date, the Manager shall provide the Director of Risk Management with a list, to be updated as necessary during the Term of this Agreement, of any and all improvements upon their completion and any and all Fixed Equipment upon its attachment to the County's property.

The County shall not be responsible to insure non-County property that the Manager and/or its approved subcontractors bring into Playland Park, including but not limited to, Removable Personal Property which the Manager and/or its approved subcontractors shall

identify in writing to the Director of Risk Management. It is recognized and understood by the Parties that the Manager and/or its approved subcontractors shall at their sole cost and expense procure insurance for all of their Removable Personal Property and provide evidence of same to the County's Director of Risk Management and that the insurance be for one hundred (100%) percent of the insurable replacement value thereof. To the extent that any loss is recouped by actual payment of the proceeds of any insurance to the Manager and/or its approved subcontractors, all such proceeds must first be used to replace such Removable Personal Property.

In the event any Fixed Equipment installed or improvements made by the Manager at Playland Park, insurable or uninsurable, are damaged or destroyed (except damage or destruction caused by the Manager as set forth below) to the extent that they are unusable by the Manager for the purposes for which they were used prior to such damage, or same are destroyed, the County shall be required to repair, replace or reconstruct such Fixed Equipment and improvements substantially as they were immediately prior to such casualty. The funds for such repair, replacement or reconstruction shall be paid from insurance proceeds, to the extent available.

In the event any portion of Playland Park is damaged or destroyed by fire or other causes, by reason of any act or omission of the Manager, and/or its approved subcontractors, their respective officers, employees or agents, which constitutes negligence or willful misconduct, this Agreement shall continue in full force and effect, and the Manager and/or its approved subcontractors, shall be responsible to pay for the cost to repair or rebuild Playland Park or any portion thereof, so damaged or destroyed, and unless otherwise reimbursable by insurance hereunder, same shall be at their own cost and expense. Manager and/or its approved subcontractors shall be responsible for any deductible under these circumstances. The failure of the Manager and/or its approved subcontractors to pay for the cost to repair or rebuild within a reasonable period of time, shall be construed as a material breach of this Agreement.

     **SECTION 20:**      **Standard Insurance and Indemnity**.

A.     The Manager agrees to procure and maintain insurance naming the County as additional insured, as provided and described in **Schedule "E",** which is attached hereto and made a part hereof. In addition to, and not in limitation of the insurance provisions contained in **Schedule "E"**, the Manager agrees:

     (i)     that except for the amount, if any, of damage contributed to, caused by, or resulting from the negligent acts or omissions or willful misconduct of the County, its officers, elected officials, employees, contractors or agents, the Manager shall indemnify and hold harmless the County, its officers, elected officials, employees, contractors and agents, from and against any and all liability, damage, claims, demands, costs, judgments, fees, reasonable attorney's fees or loss arising out of the negligent acts or omissions or the reckless or willful misconduct of the Manager, its officers, employees, contractors or agents; and

     (ii)     to provide defense for and defend, at its sole expense, any and all claims, demands or causes of action relating to this Agreement and arising out of the

negligent acts or omissions or willful misconduct of the Manager, its officers, employees, contractors or agents and to bear all other reasonable costs and expenses related thereto.

B.     The County shall indemnify and hold the Manager harmless for any act/occurrence prior to the Management Commencement Date and after said date for any act/occurrence with respect to work undertaken by the County in accordance with its responsibilities under Section 2-a and Section 12 hereof, and the County shall defend any action arising out of said act/occurrence and be responsible for all costs and expenses relating thereto, including but not limited to Manager's reasonable attorney fees should it become necessary for the Manager to retain counsel.

**SECTION 21:**      **Events of Default**.

Any of the following shall be an event of default, the continuation of which beyond the expiration of any time permitted herein to cure shall thereupon be deemed an "Event of Default" under this Agreement:

A.     With respect to the Manager:

(i)     the Manager shall fail to perform or observe any material obligation of the Manager under any provision of this Agreement, and such failure shall continue and shall not be remedied within thirty (30) days after notice from the Commissioner specifying the nature of the default.     Notwithstanding the immediately preceding sentence, it shall not be an Event of Default if, for causes beyond the reasonable control of the Manager, such failure cannot be cured within thirty (30) days, as long as the Manager immediately takes steps necessary to remedy same and duly institutes and diligently prosecutes same to completion. For tasks in this Agreement which requires performance within less than thirty (30) days, e.g., filing an accident report within 24 hours, then the Manager shall only have an equivalent time period from the time of notice within which to cure; or

(ii)     the Manager shall fail to procure and maintain the insurance policies required by this Agreement and such failure shall continue for fifteen (15) days after notice from the County Director of Risk Management specifying the same; provided, however, that should the Manager fail to procure and maintain Commercial General Liability insurance for the operation of Playland Park after the Management Commencement Date, as required by Section 19  and **Schedule "E"**, then this Agreement shall terminate immediately, there shall be no opportunity to cure and the provisions of Section 22 below shall not apply; or

(iii)     the Manager abandons Playland Park after the Management Commencement Date, or ceases to manage Playland Park after the Management Commencement Date; or

(iv)     any or all of the Manager's interest in this Agreement or Playland Park or any part thereof shall be taken upon execution or by other process of law directed against

39

the Manager, or shall be taken upon or subject to any attachment at the instance of any creditor of or claimant against the Manager, and said attachment shall not be bonded, discharged or disposed of within ninety (90) days after levy thereof.

B.    With respect to the County:

If the County shall fail to perform or observe any material obligation of the County under any provision of this Agreement, and such failure shall continue and shall not be remedied within thirty (30) days after notice from the Manager specifying the nature of the default.

Notwithstanding the immediately preceding sentence, it shall not be an Event of Default if, for causes beyond the reasonable control of the County, such failure cannot be cured within thirty (30) days, as long as the County immediately takes steps necessary to remedy same and duly institutes and diligently prosecutes same to completion.  For tasks in this Agreement which requires performance by the County within less than thirty (30) days, the County shall only have an equivalent time period from the time of notice within which to cure.

**SECTION 22:    Remedies for Default**.

A.    After a material Event of Default on the part of the Manager, the Commissioner shall have the right to elect to terminate this Agreement by notice to the Manager as provided in Section 23 below, subject to all necessary legal approvals.

B.    After a material Event of Default on the part of the County, the Manager shall have the right to elect to terminate this Agreement by notice to the Commissioner as provided in Section 23 below.

C.    The failure of either the County or the Manager to seek redress for any Event of Default, or to insist upon the strict performance of any provision of this Agreement, shall not prevent a subsequent act, which would have originally constituted an Event of Default from having all the force and effect of an original Event of Default.

**SECTION 23:    Termination**.

A.    If the Commissioner elects to terminate this Agreement pursuant to Section 22 above, the Manager shall be given a thirty (30) day written notice of the election to so terminate, specifying in such notice a termination date and on such date this Agreement shall terminate in all respects, provided that (except as otherwise provided in this Agreement) no party hereto shall be relieved of any obligation or liability which accrued prior to such date.  After the receipt of such notice and on or before such termination date, unless the Event of Default (if applicable) giving rise to such termination notice has been theretofore cured, the Manager shall vacate Playland Park in accordance with the provisions of this Agreement.

B.    If the Manager elects to terminate this Agreement pursuant to Section 22 above, it shall give the Commissioner a thirty (30) day written notice of its election so to terminate, specifying in such notice a termination date (except as otherwise provided in this Agreement), and on such date this Agreement shall terminate in all respects, provided that (except as otherwise provided in this Agreement) no party hereto shall be relieved of any obligation or

liability which accrued prior to such date. After the giving of such notice and on or before such termination date, unless the Event of Default (if applicable) giving rise to such termination notice has been theretofore cured, the Manager shall vacate Playland Park in accordance with the provisions of this Agreement.

The date upon which either the Commissioner pursuant to subsection A above, or the Manager pursuant to this subsection B, may terminate this Agreement shall be called the "Termination Date".

C.     Unless earlier terminated upon an Event of Default, this Agreement shall expire on the Expiration Date, and on or before such day the Manager shall vacate Playland Park, unless a new agreement for the purposes herein is entered into by the Parties.

D.     Upon termination or expiration of this Agreement, the Manager shall assign to the County, at the County's option, any contracts with third parties that shall then be in effect.

E.     Upon termination or expiration of this Agreement, all rights of the Manager under this Agreement shall revert to the County or its designee, and the County and the Manager shall have no further responsibility or liability under or with respect to this Agreement, except as provided in Section 23B below and except that within thirty (30) days of the Termination Date or of the Expiration Date, as the case may be, the Manager shall deliver to the Commissioner an accounting for the year prior to the Termination Date or Expiration Date and Manager shall be obligated to pay the County any sums due and owing under this Agreement as a result of that accounting. Such accounting shall be performed by a certified public accountant licensed in New York State in accordance with generally accepted accounting principles.

**SECTION 23A:     Termination Due to Unexpected Risk Event.**

The Manager shall have the right to terminate this Agreement if:

(i)     the County fails to appropriate sufficient funds to carry out its responsibilities under this Agreement which in turn materially impacts the ability of the Manager to carry out its duties under this Agreement; or

(ii)    in the event that damage to the property, buildings and equipment of Playland Park due to Force Majeure is so severe that the material revenue generating operations of the Park cannot be resumed within a period of: three (3) months when the Playland Park is "in-season:" and six (6) months when Playland Park is "off-season" as those terms are defined in Section 2(C) above; or

(iii)   a lawsuit or administrative proceeding brought by a third party successfully invalidates this Agreement or as a result of a decision in a lawsuit or an administrative proceeding brought by a third party, the rights of the Manager under this Agreement are modified in whole or in part and as a result of such modification the economic value to the Manager of this Agreement has been substantially reduced; or

(iv)     in the event a law is adopted by the Board of Legislators or a county regulation is
adopted or modified which specifically relates to Rye Playland the result of which
substantially reduces the economic value to the manager of this Agreement (each
an "Unexpected Risk Event").

**SECTION 23B:        Recovery of Manager's Investment.**

It is recognized and understood by the Parties that the Manager is making a large
investment in Playland Park. If the Agreement is terminated due to a default by the County as
defined in Section 21(B) above, or by the Manager due to an Unexpected Risk Event as set forth
in Section 23A above, as a result of a taking under eminent domain pursuant to Section 15, or by
the County pursuant to Section 3(G) above, then the County, consistent with Section 13, shall
reimburse the Manager in accordance with the following schedule: (i) if the Agreement is
terminated within the first twenty-four (24) months from the Management Commencement Date,
the County shall reimburse the Manager for the entire amount of the Manager's Investment
actually made by the date of termination; and (ii) subsequent to the first twenty-four (24) months
from the Management Commencement Date, the County shall reimburse the Manager for the
unamortized portion of the Manager's Investment actually made by the date of termination as
determined on a straight-line depreciation basis over the term remaining after the first twenty-
four (24) months of this Agreement, net of any insurance proceeds that the Manager is entitled to
recover. For purposes of clarifying the Parties' intent the following examples are provided. If
the Manger has invested $27,750,000 and the Agreement is terminated as described above in the
3rd year, the Manager would be entitled to the return of its $27,750,000 less one twenty-eighth of
the investment or $26,758,929. If the Manager has invested $27,750,000 and the Agreement is
terminated as described above in the 7th year, the Manager would be entitled to the return of its
$27,750,000 investment less five twenty-eighths of the investment or $22,754,645.

Any payment due by the County hereunder shall be paid not more than sixty (60) days
after this Agreement has been terminated. If any payments due from the County hereunder are
not made within sixty (60) days after the termination by the Manager hereof, such unpaid amount
shall bear interest at the Default Rate as defined in Section 1(C) above.

**SECTION 24:        Non-Discrimination.**

The Manager expressly agrees that neither it nor any approved subcontractor, employee,
or any other person acting on its behalf shall discriminate against or intimidate any employee or
other individual on the basis of race, creed, religion, color, gender, age, national origin, ethnicity,
alienage or citizenship status, disability, marital status, sexual orientation, familial status, genetic
predisposition or carrier status during the Term of this Agreement, as those terms may be defined
in Chapter 700 of the Laws of Westchester County. The Manager acknowledges and
understands that the County maintains a zero tolerance policy prohibiting all forms of
harassment or discrimination against its employees by co-workers, supervisors, vendors,
contractors, or others.

**SECTION 25:**      **Compliance with Laws**.

A.      The Manager, and all approved subcontractors, shall comply, at their own expense, with the provisions of all applicable local, state and federal laws, rules and regulations, orders and ordinances and other legal requirements ("Law or Laws").

B.      Subject to any necessary legal approvals, the Manager may appeal or contest the validity or application of any Law upon the following conditions:

(i)      the Manager shall appeal or contest the same in good faith and by appropriate proceedings;

(ii)      such appeal or contest (or any resulting delay in compliance with any Law) shall not subject the County to any criminal or civil sanction, fine or penalty, or to any other financial obligation or liability, unless the Manager furnishes the County with a written undertaking, in form acceptable to the County Attorney in his/her reasonable discretion, to indemnify the County against the same; and

(iii)      the Manager from time to time shall advise the County Attorney, upon written request of the County Attorney, as to the status of any such appeal or contest.

**SECTION 26:**      **MBE/WBE**.

Pursuant to Section 308.01 of the Laws of Westchester County, it is the goal of the County to use its best efforts to encourage, promote and increase the participation of business enterprises owned and controlled by persons of color or women in contracts and projects funded by all departments of the County. Attached hereto and forming a part hereof as **Schedule "G"** is a questionnaire entitled "Business Enterprises Owned and Controlled by Persons of Color or Women" which the Manager agrees to complete.

**SECTION 27:**      **Records and Intellectual Property**.

In connection with the performance of the Manager's obligation and exercise of rights under this Agreement, the County grants to the Manager an exclusive, non-transferable, royalty-free license during the Term to use the names "Playland" or "Rye Playland" together with all existing and future developed logos, trademarks and copyrights owned by the County and used in connection with Playland Park. Notwithstanding the above, the Manager shall reimburse the County any and all costs and expenses incurred by the County in connection with same. The Manager may grant sublicenses of the same to the subcontractors and to vendors. All logos, trademarks and copyrights owned by the County or licensed by the Manager from and after the Management Commencement Date, or newly created logos, trademarks or copyrights created by the Manager during the Term for use with respect to the operation of Playland Park, shall remain exclusively the property of the County. Notwithstanding the above, all newly created logos, trademarks and copyrights created by the Manager for use with respect to the operation of Playland Park are subject to the prior written approval of the Commissioner, which shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, the County shall retain a right to use County owned logos, trademarks and copyrights licensed to Manager, so long as such use does not adversely impact the Manager's rights under this Agreement.

43

All records or recorded data of any kind compiled by the Manager in completing the Work described in this Agreement and relating specifically and exclusively to the Work, including but not limited to written reports, studies, drawings, blueprints, computer printouts, graphs, charts, plans, specifications and all other similar recorded data, shall become and remain the property of the County. The Manager may retain copies of such records for its own use and shall not disclose any such information without the express written consent of the Commissioner. The County shall have the right to reproduce and publish such records, if it so desires, at no additional cost to the County, subject to any third party restrictions.

Notwithstanding the foregoing, all deliverables that contain or constitute intellectual property (e.g. advertising, or signs) created under this Agreement by the Manager specifically and exclusively relating to the Work are to be considered "works made for hire." If any of the deliverables do not qualify as "works made for hire," the Manager hereby assigns to the County all right, title and interest (including ownership of copyright) in such deliverables and such assignment allows the County to obtain in its name copyrights, registrations and similar protections which may be available. The Manager agrees to assist the County, if required, in perfecting these rights, at the County's sole cost and expense. The Manager shall provide the Commissioner with at least one copy of each deliverable.

Notwithstanding the foregoing, any and all intellectual property, including but not limited to the Manager trademarks, copyrights and protected property related to the Manager's general company operations shall remain the property of the Manager.

The Manager agrees to obtain from any approved subcontractor or other third party engaged by the Manager to deliver Work product containing intellectual property, a representation and warranty to defend, indemnify and hold harmless the County and the Manager for all damages, liabilities, losses and expenses arising out of any claim that a deliverable infringes upon an intellectual property right of a third party. If such a claim is made, or appears likely to be made, the Manager agrees to require approved subcontractor or other third party to provide documentation that will enable the County's continued use of the deliverable, or to modify or replace it. If the Commissioner determines that none of these alternatives is reasonably available, the deliverable shall be returned, to the extent the deliverable can be returned.

Except as provided above, the Manager shall not claim ownership to or use of any County intellectual property such as trademarks, copyrights and other such protected property without written permission from the County.

**SECTION 28:**     **Independent Contractors**.

The Manager and the County agree that the Manager, and its approved subcontractors, and their respective officers, employees, agents, and any third parties acting on their behalf, are independent contractors and not employees of the County or any department, agency or unit thereof. In accordance with their status as independent contractors, the Manager covenants and agrees that neither the Manager, nor its approved subcontractors, and their respective officers, employees, agents, and any third parties acting on their behalf, will hold themselves out as, or claim to be, officers or employees of the County or any department, agency or unit thereof.

44

**SECTION 29:**       **Criminal Background Disclosure.**

The Manager agrees to complete the Criminal Background Disclosure as required by Executive Order No. 1-2008 and attached hereto as **Schedule "H"**, which is hereby incorporated by reference.

**SECTION 30:**       **MacBride.**

Pursuant to Act No. 56-1999, as codified in Chapter 310 of the Laws of Westchester County, no County procuring officer may award or recommend for award any contract not subject to competitive bidding to a party that does not execute a certification in substantially the form attached hereto and forming a part hereof as **Schedule "I"**. Therefore, the Manager agrees, as part of this Agreement, to complete the form attached hereto as **Schedule "I"**.

**SECTION 31:**       **Required Disclosure.**

Attached hereto and forming a part hereof as **Schedule "J"** is a questionnaire entitled "Required Disclosure of Relationships to County." The Manager agrees to complete said questionnaire as part of this Agreement. In the event that any information provided in the completed questionnaire changes during the Term of this Agreement, Manager agrees to notify Commissioner in writing within ten (10) business days of such event. The Manager shall also have each approved subcontractor complete this questionnaire and shall advise each approved subcontractor of the duty to report any changes to the information contained therein to the Manager within ten (10) business days of such event and such information shall be forwarded by the Manager to the Commissioner.

**SECTION 32:**       **No Waiver.**

Failure of either party hereto to insist, in any one or more instances, upon strict performance of any term or condition herein contained shall not be deemed a waiver or relinquishment of such term or condition, but the same shall remain in full force and effect. Acceptance by either party of any Work or the payment of any fee or reimbursement due hereunder with knowledge of a breach of any term or condition hereof, shall not be deemed a waiver of any such breach and no waiver under such circumstances by a party of any provision hereof shall be implied.

**SECTION 33:**       **No Lease.**

Neither Playland Park, nor any land, building, space, improvement or equipment is being sold or leased hereunder, nor is any interest in real property being granted, or any possessory right with respect to the Playland Park or any part thereof being granted, to the Manager and/or its approved subcontractors; but the Manager shall manage and operate Playland Park at all times on behalf of the County. Under no circumstances shall this Agreement be construed as granting the Manager, or its approved subcontractors, any real property rights, nor any title or interest of any kind or character in, on, or about Playland Park.

**SECTION 34:**          **Notices**.

All notices of any nature referred to in this Agreement shall be in writing and either sent by registered or certified mail postage pre-paid, or delivered by hand or overnight courier, or sent by facsimile (with acknowledgment received and a copy of the notice sent by registered or certified mail postage pre-paid), or email (with a copy of the notice also sent by overnight, registered or certified mail postage pre-paid) as set forth below or to such other addresses as the respective Parties hereto may designate in writing.  Notice shall be effective on the date of receipt.  Notices shall be sent to the following:

To the County:

> County Executive
> County of Westchester
> Michaelian Office Building, 9th Floor
> 148 Martine Avenue
> White Plains, NY  10601

> Chair
> County Board of Legislators
> Michaelian Office Building, 8th Floor
> 148 Martine Avenue
> White Plains, NY  10601

With copies to:

> Commissioner
> Westchester County Department of Parks, Recreation & Conservation
> 450 Saw Mill River Road
> Ardsley, NY  10502

> Commissioner
> Westchester County Department of Public Works and Transportation
> Michaelian Office Building, Room 518
> 148 Martine Avenue
> White Plains, New York 10601

> County Attorney
> Michaelian Office Building, Room 600
> 148 Martine Avenue
> White Plains, New York 10601

To the Manager:

> Standard Amusements LLC
> 767 Fifth Avenue
> New York, New York 10153

With copies to:

> Winston & Strawn LLP
> 200 Park Avenue
> New York NY 10166
> Attn.: James S. Normile, Esq. and William F. Dudine, Esq.

### SECTION 35:      Definition of Commissioner.

Notwithstanding anything contained herein to the contrary, it is agreed by the Parties that if it were to be concluded or determined that it has been and now is inappropriate for the Department of Parks, Recreation and Conservation and its Commissioner to manage and operate Playland Park based upon the definitional provisions in Chapter 134 and 249 of the Laws of Westchester County ("LWC"), then the day to day management and operations of Playland Park would fall to the DPW&T Commissioner who is "in charge of the preservation and maintenance of all buildings and grounds owned by the county for county purposes, except the lands and buildings under the jurisdiction of the Department of Parks, Recreation and Conservation..." (LWC Section 241.261) or, alternatively, the day-to-day management and operations of Playland Park would fall to the County Executive pursuant to Chapter 110 of the LWC which provides among other things, that the County Executive "shall be the chief executive and administrative officer of the county government.  It shall be the duty of the County Executive: (1) to supervise, direct and control, subject to law and the provisions of this act and local laws, the administrative services and departments of the county." (LWC Section 110.11).

### SECTION 36:      Entire Agreement.

This Agreement and its attachments constitute the entire Agreement between the Parties with respect to the subject matter hereof and shall supersede all previous negotiations, commitments and writings.  It shall not be released, discharged, changed or modified except by an instrument in writing signed by a duly authorized representative of each of the Parties.

### SECTION 37:      No Third Party Rights.

Nothing herein is intended or shall be construed to confer upon or give to any third party or its successors and assigns any rights, remedies or basis for reliance upon, under or by reason of this Agreement, except in the event that specific third party rights are expressly granted herein.

### SECTION 38:      Conflict of Interest.

The Manager shall use all reasonable means to avoid any conflict of interest with the County and shall immediately notify the Commissioner in the event of a conflict of interest.  The Manager shall also use all reasonable means to avoid any appearance of impropriety.

**SECTION 39:**      **Force Majeure**

Neither the County nor the Manager, as the case may be, shall be deemed in breach hereof if it is prevented from or materially delayed in performing any of the obligations hereunder by reason of acts of God, acts of terrorism, acts of the public enemy, acts of superior governmental authority, strikes or labor disputes, floods, riots, rebellion, sabotage, or any other similar circumstances not within its reasonable control.

**SECTION 40:**      **Authority**.

The Board of Legislators has duly authorized this Agreement by Act No. 2015-100, 2015-99 and 2015-98 all approved by the Board of Legislators at a meeting duly held on 15th - day of June, 2015, by Act No. 2016-35__ approved by the Board of Legislators at a meeting duly held on 30th day of March, 2016, and by Act No. 2016-88 approved by the Board of Legislators at a meeting duly held on 18th day of April, 2016.

The BAC has duly authorized this Agreement by Resolution approved at its meeting held on the 18th day of June, 2015 and the 31st day of March, 2016 and the 21st day of April, 2016.

**SECTION 41:**      **Enforceability**.

This Agreement shall be construed and enforced in accordance with the laws of the State of New York. In addition, the Parties hereby agree that for any cause of action arising out of this Agreement, any such action shall be brought in the County of Westchester, New York.

If any term or provision of this Agreement is held by a court of competent jurisdiction to be invalid or void or unenforceable, the remainder of the terms and provisions of this Agreement shall in no way be affected, impaired, or invalidated, and to the extent permitted by applicable law, any such term, or provision shall be restricted in applicability or reformed to the minimum extent required for such to be enforceable. This provision shall be interpreted and enforced to give effect to the original written intent of the Parties prior to the determination of such invalidity or unenforceability.

**SECTION 42:**      **County Attorney Opinion**.

It is recognized and understood by the Parties that, in addition to all other rights of termination set forth herein, the Manager has the option to terminate this Agreement if a separate opinion from the Westchester County Attorney addressed to the Manager is not given stating that when this Agreement has been duly authorized by the Board of Legislators and the BAC and has been fully executed by the Parties, that it will be a valid, binding and enforceable agreement. Said form of opinion shall be reasonably acceptable to the Manager and shall be delivered simultaneously with the execution of this Agreement by the Parties hereto. In the event said opinion is not delivered and the Manager terminates this Agreement, then all amounts held in escrow as described in Section 1 shall be paid to the Manager.

**IN WITNESS WHEREOF**, The County of Westchester and the Manager have caused this Agreement to be executed on the day and year first above written.

### THE COUNTY OF WESTCHESTER

By: _____

ACTING COUNTY EXECUTIVE

### STANDARD AMUSEMENTS, LLC

By: _____

Approved by the Westchester County Board of Legislators at a meeting duly held on 15th day of June, 2015 by Act No. 2015-100, 2015-99 and 2015-98 and by Act No. 2016-101 at a meeting duly held on 2nd day of May , 2016.

Approved by the Board of Acquisition and Contract of the County of Westchester on the 18th day of June, 2015 and ___May 3___ , 2016.

Approved as to form
and manner of execution

_____
Associate County Attorney
County of Westchester

s/a/PRC/Playland RFP/ SA Management Agr Restated and Amended.docx

**ACKNOWLEDGMENT**

STATE OF FLORIDA     )
                     ) ss.:
COUNTY OF Volusia    )

On the _3rd_ day of _May_ in the year 2016 before me, the

undersigned, personally appeared Jacob T. Falfas, personally known to me or proved to me on

the basis of satisfactory evidence to be the individual whose name is subscribed to the within

instrument and acknowledged to me that he/she executed the same in his/her capacity(ies) as

Authorized Signer, and that by his/her signature on the instrument, the individual, or the person

upon behalf of which the individual acted, executed the instrument.

Date: _5/3/16_                          _Sue C. Bianco_
                                        Notary Public

Notary Public State of Florida
Suzanne CapoBianco
My Commission FF 016978
Expires 05/14/2017

## CERTIFICATE OF AUTHORITY-LIMITED LIABILITY COMPANY

I, Nicholas Singer, _____

                (member or manager other than person executing the agreement)

certify that I am a ___member___ of _____Standard Amusements LLC_____

           (member/manager)       (Name of Limited Liability Company)

(the "LLC") duly organized under the Laws of the State of _____Delaware_____; that

                                                   (Name of State)

_____Jacob T. Falfas_____ who signed said Agreement on behalf of the LLC

       (Person Executing Agreement)

was, at the time of execution, a manager of the LLC; that said Agreement was duly signed for and on behalf of said LLC and as the act of said LLC for the purposes therein mentioned.

_____
(Signature)

STATE OF New York       )
                          ss.:
COUNTY OF New York   )

On the 3rd day of May in the year 2016 before me, the undersigned, a Notary Public in and for said State, Nicholas Singer personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be the member/manager described in and who executed the above certificate, who being by me duly sworn did depose and say that he/she resides at 45 Walker St, Apt#2, NY, NY, and he/she is a member/manager of said LLC; that he/she is duly authorized to execute said certificate on behalf of said LLC, and that he/she signed his/her name thereto pursuant to such authority.

Date: 5/3/16

_____
Notary Public

GARY R. BASSO
Notary Public, State of New York
No. 4880911
Qualified in Westchester County Dutchess
Commission Expires Dec. 29, 20 18

## **Exhibit B**

### **Committees**

Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtor's knowledge and belief, no committee has been organized prior to the Petition Date.

**Exhibit C**

**Consolidated List of 20 Largest Unsecured Claims (Excluding Insiders)[1]**

Pursuant to Local Rule 1007-2(a)(4), the following is a list of creditors holding the twenty (20) largest, unsecured claims against the Debtor, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Quinn Emanuel 865 S. Figueroa St 10th Floor Los Angeles, CA 90017 | Andrew Berdon andrewberdon@quinnemanuel.com (212) 849-7107 | Professional Services | Contingent | | | $178,130.04 |
| AtelierNY Architecture 21-34 44th Road Long Island City, NY 11101 | Jonathan Miller jmiller@atelierny.com (718) 707-9550 | Professional Services | Contingent | | | $145,282.98 |
| Akerman LLP 50 North Laura Street Suite 3100 Jacksonville, FL 32202 | Rema Awad rema.awad@akerman.com (904) 598-8668 | Professional Services | | | | $55,569.05 |
| Gasthalter & Co. 733 Third Avenue 16th Floor New York, NY 10017 | Jonathan Gasthalter jg@gasthalter.com (212) 257 4170 | Professional Services | | | | $39,231.88 |
| DelBello Donnellan Weingarten Wise 1 North Lexington Ave. White Plains, NY 10601 | Alfred E. Donnellan AED@ddw-law.com (914) 681-0200 | Professional Services | | | | $19,572.84 |
| BDO USA LLP 501 Riverside Avenue Suite 800 Jacksonville, FL 32202 | Paul Davison PDavison@bdo.com (904) 396-4015 | Professional Services | | | | $18,000.00 |

---

[1]  The information herein shall not constitute an admission of liability by, nor is it binding on, the Debtor. All claims are subject to customary offsets, rebates, discounts, reconciliations, credits, and adjustments, which are not reflected on this Schedule.

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Maniglia, Andrew 15 Eastview Drive Valhalla, NY 10595 | Andrew Maniglia amaniglia@StandardAmusements.com | Employee Wages | | | | $16,224.07 |
| SS KS LLC (Sunshine Sachs) 136 Madison Avenue 17th Floor New York, NY 10016 | John Schaefer schaefer@sunshinesachs.com (212) 691-2800 | Professional Services | | | | $16,000.00 |
| Berni, Beau 6798 Tarfford Ct. Liberty Township, OH 45044 | Beau Berni bberni@unitedparks.com | Employee Wages | | | | $15,583.33 |
| Harding, John 353 East 83rd Street, 8-H New York, NY 10028 | John Harding jharding@StandardAmusements.com | Employee Wages | | | | $13,500.00 |
| PLA Patricia Lynch Associates Inc. 677 Broadway, Suite 205 Albany, NY 12207 | Patricia Lynch (518) 650-7169 | Professional Services | | | | $5,000.00 |
| Bell, Georgia 540 Fourth Street Mamaroneck, NY 10543 | Georgia Bell gbell@StandardAmusements.com | Employee Wages | | | | $2,500.00 |
| TVEyes Inc. 1150 Post Road Fairfield, CT 06824 | Dan Miles dmiles@tveyes.com (203) 254-3600 | Professional Services | | | | $2,400.00 |
| Williams Scotsman 901 S. Bond Street Suite 600 Baltimore, MD 21231-3357 | Legal Department (800) 638-6963 (410) 933-5940 (fax) | Property Lease | | | | $1,597.00 |
| Intrinzic Technologies, LLC 10 Ellsworth Avenue Staten Island, NY 10312 | Robert Corride rcorride@intrinzictech.com | Professional Services | | | | $644.26 |
| Keeler, Evonne 137 Linden Avenue Emerson, NJ 07630 | Evonne Keeler ekeeler@unitedparks.com | Employee Wages | | | | $334.65 |

| Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Optimum<br>PO Box 9256<br>Chelsea, MA<br>02150-9256 | (914) 777-9000 | Trade Debt | | | | $222.03 |
| New York State Department of Taxation and Finance Bankruptcy Section PO Box 5300 Albany, NY 12205-0300 | | Tax Fees | | | | $50.00 |

**<u>Exhibit D</u>**

**Holders of Five (5) Largest Secured Claims**
**Against the Debtor on a Consolidated Basis**

      Pursuant to Local Bankruptcy Rule 1007-2(a)(5), to the best of the Debtor's knowledge and belief, there are no liquidated secured claims against the Debtor.

**Exhibit E**

**Summary of Debtor's Assets and Liabilities**

| Assets | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Cash | | | | | | | | $ 211,669.34 |
| | Due From Westchester County | | | | | | | | 39,061.30 |
| | Prepaid Legal | | | | | | | | 101,157.50 |
| | | | | | | | | | |
| | | | | | | | | | 351,888.14 |
| | | | | | | | | | |
| | | | Total Assets | | | | | | 351,888.14 |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| Curent Liabilities | | | | | | | | | |
| | Accounts Payable | | | | | | | | 529,792.13 |
| | Accrued Payroll | | | | | | | | 62,916.66 |
| | Due to United Parks | | | | | | | | 112,349.57 |
| | | | | | | | | | |
| | | | | | | | | | 705,058.36 |
| | | | | | | | | | |
| | | | Total Liabilities | | | | | | 705,058.36 |

## <u>Exhibit F</u>

**The Debtor's Securities**

Pursuant to Local Rule 1007-2(a)(7), the Debtor does not have any publicly traded stock, debentures, or securities.

**Exhibit G**

**Debtor's Property Not in the Debtor's Possession**

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), to the best of the Debtor's knowledge and belief, none of the Debtor's property is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for such entity.

## **Exhibit H**

### **Debtor's Premises**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the premises owned, leased, or held under other arrangement from which the Debtor operates its business as of the Petition Date:

| Lessor and Contact Information | Address of Property | Type of Interest |
|---|---|---|
| Williams Scotsman<br>901 S. Bond Street<br>Suite 600<br>Baltimore, MD<br>21231-3357 | Standard Amusements<br>1 Playland Parkway<br>Rye, NY  10580 | The Debtor is in use and possession of certain leased real estate |

## **Exhibit I**

### **Location of Debtor's Substantial Assets and Books and Records, and Nature and Location of Debtor's Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following lists the location of the Debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the Debtor outside the territorial limits of the United States.

| Debtor's Assets | Location |
|---|---|
| Debtor's Substantial Assets | The Debtor's substantial assets are located in New York |
| Debtor's Assets Outside the United States | Not Applicable |

### **Debtor's Books and Records**

Standard Amusements
1 Playland Parkway
Rye, NY 10580

## **Exhibit J**

### **List of Actions Against the Debtor**

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists the nature and present status of each action or proceeding, pending or threatened, against the Debtor or its property where a judgment against the Debtor or a seizure of its property may be imminent:

- Threatened breach of contract action with the County of Westchester related to the Restated and Amended Playland Management Agreement, dated May 3, 2016, as discussed in this Declaration.

**<u>Exhibit K</u>**

**Senior Management**

       Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the Debtor does not have any existing senior management.

## Exhibit L

### Payroll

Pursuant to Local Bankruptcy Rule 1007-2((b)(1)-(2)(A) and (C), the following provides the estimated amount of weekly payroll to the Debtor's employees (not including officers, directors and stockholders) and the estimated amount to be paid to officers, directors, stockholders and financial and business consultants retained by the Debtor for the 30-day period following the Petition Date.

| | |
|---|---|
| **Payments to Employees (Not Including Officers, Directors, and Stockholders)** | $60,735.89 |
| **Payments to Officers, Stockholders, and Directors** | $0 |
| **Payments to Financial and Business Consultants** | $0 |

## Exhibit M

### Cash Receipts and Disbursements, Net Cash
### Gain or Loss, Unpaid Obligations and Receivables

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the commencement of the Chapter 11 case, the Debtor's estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

| | |
|---|---|
| **Cash receipts** | $0 |
| **Cash Disbursements** | $97,283 |
| **Net Cash Loss** | ($97,283) |
| **Uncollected Receivables** | $0 |